**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David PARKER, Brenda Brown, Ingrid Anderson, Charles Gruber and Lonnie O'Shea Kilpatrick, Defendants-Appellants.**

**No. 86–3383.**

United States Court of Appeals, Eleventh Circuit.

March 15, 1988.

1474

Bennie Lazzara, Jr., Tampa, Fla., for Parker and Gruber.

Dillinger & Swisher, Robert H. Dillinger, St. Petersburg, Fla., for Brown.

Winkles, Trombley & Kynes, Stuart C. Markman, Tampa, Fla., for Anderson.

Barry A. Cohen, Rochelle A. Reback, Tampa, Fla., for Kilpatrick.

Judy Hoyer, State Atty.'s Office, Tampa, Fla., Maury S. Epner, U.S. Dept. of Justice, Washington, D.C., for U.S.

Before JOHNSON and EDMONDSON, Circuit Judges, and HOFFMAN [*], Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge:

Appellants were convicted of conspiracy and mail fraud under 18 U.S.C. section 1341. Appellant Lonnie O'Shea Kilpatrick is president and sole owner of Government Securities, Inc. (GIC), a licensed securities broker in Florida primarily dealing in government insured investments. In an effort to generate cash needed to meet the company's financial obligations, Kilpatrick devised a plan to sell short-term investments backed by long-term bonds. At a company sales meeting, Kilpatrick explained the investment to his brokers as a ninety-day instrument yielding 10¼%, collateralized by $10 to $12 million in government bonds. The brokers successfully sold the instruments, representing to their clients that the investments were backed by the federal government. After each sale the broker mailed to the customer a sales confirmation along with a brochure explaining the investment.

Kilpatrick's plan turned out to be fraudulent. Instead of $10 to $12 million, as represented by Kilpatrick, GIC had less than $500,000 in bonds to back over $6 million worth of ninety-day instruments. Consequently, the government closed GIC and indicted Kilpatrick along with his four top salespersons on conspiracy and mail fraud counts. After a week-long trial, a jury returned guilty verdicts against each appellant on both the conspiracy and mail fraud charges. This appeal challenges 1) the sufficiency of the evidence adduced at trial to sustain the convictions, 2) the district court's refusal to instruct the jury that the appellants' good faith reliance on the advice of counsel could negate the intent to defraud, and 3) the district court's failure to instruct the jury, *sua sponte*, that certain extrinsic act evidence should be considered for a limited purpose. After careful review of the record below, we find the evidence insufficient to uphold the convictions of appellants on the conspiracy count, insufficient to uphold the convictions of appellant salespersons on the fraud counts, but sufficient to uphold appellant Kilpatrick's convictions on the fraud counts. Accordingly, we affirm in part and reverse in part.

## FACTS

Appellants Brenda Brown, Charles Gruber, Ingrid Anderson and David Parker

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

worked as securities brokers for GIC, a licensed securities dealer in Florida, wholly owned by its president, the appellant Lonnie Kilpatrick. GIC primarily sold government backed securities such as Ginnie Maes (securities backed by Government National Mortgage Association) and Freddie Macs (securities backed by Federal Home Loan Mortgage Corporation). In addition, GIC sold zero coupon bonds, also known as CATs, Tigers and TBRs, depending upon the brokerage house offering the bonds. Zero coupon bonds are treasury bonds that have had the interest coupons clipped by the purchaser of the bonds. This purchaser sells the remaining bond for about 10% of its face value. The deep discount reflects the many years, usually fifteen to thirty, that remain until the bond may be redeemed at face value. The obvious disadvantage of investing in zero coupon bonds as well as Ginnie Maes and Freddie Macs is the long period between initial investment and maturity.[1] The advantage of these long-term investments is the security afforded by United States Government backing.

Recognizing a market for short-term investments, GIC set up the "Southern Bond" and "Delmar" trusts. Investments in these trusts provided a return in six months. The trusts were backed by Ginnie Maes, Freddie Macs, zero coupon bonds and income producing property. In early 1985, Florida's Division of Securities determined that GIC's offering of the Southern Bond and Delmar trusts was in reality the sale of unregistered securities. Since GIC was not licensed to sell such investments, the Division of Securities entered an administrative order against the firm threatening to revoke its registration. After negotiations with Florida's Comptroller of the Currency, GIC, through Kilpatrick, entered

into a stipulation and consent order in which the state agreed to drop the charges and GIC agreed to liquidate the dubious trusts and repay its customers. The schedule of payments in the consent order required GIC to pay $10.3 million to its customers between July 1 and November 1, 1985. Unfortunately, the money invested in the trusts was more than the trusts were worth.[2] Consequently, GIC found itself with a cash flow problem when it began liquidating the trusts and trying to repay customers.

On or about June 14, 1985, at a manager's meeting in Tampa, Kilpatrick allegedly "dreamed up" a plan to increase cash flow for the company and thus meet the financial burden imposed by the consent decree. The plan involved selling short-term investments Kilpatrick labeled "zero coupon treasury instruments" (ZCTIs). Kilpatrick explained that GIC had $10 to $12 million worth of zero coupon bonds in the company vault in Olive Branch, Mississippi. He instructed his sales staff, including appellants Brown, Gruber, Anderson and Parker to sell the ZCTIs as ninety-day investments. Ninety days after sale, GIC would repurchase the instrument, giving the customer a 10¼% yield. Kilpatrick explained that the investment instruments were collateralized by the zero coupon bonds in Olive Branch. He specifically instructed the brokers to represent that the 10¼% was "earnings" and not "interest." He also made clear that the brokers were selling "instruments" and not the actual zero coupon bonds. During the meeting, Kilpatrick allegedly spoke to the company attorney by phone who informed Kilpatrick that the proposed instrument was not an unregistered security and, therefore, GIC could market the instrument legally. The record

---

**1.** Ginnie Maes, Freddie Macs and zero coupon bonds all have lengthy periods between issuance and maturity of the investment. Ginnie Maes and Freddie Macs, however, provide their holders with periodic interest payments and principal, while zero coupon bonds provide a single large payoff upon maturity.

**2.** According to the record, the Delmar trust was made up of government bonds along with income producing property. Under the stipula-

tion and consent order, GIC had to liquidate the trust, including the property, to repay its customers. For reasons unclear in the record, GIC was unable to liquidate the income producing property. Consequently, GIC could not make payments under the consent decree without increasing the company's cash flow. This case stems from the plan Kilpatrick devised to generate cash.

reveals nothing more discussed at the manager's meeting concerning ZCTIs. From the time of the manager's meeting until the state closed GIC in October of 1985, the appellant salespersons sold over $6 million worth of ZCTIs, mostly to repeat customers interested in low risk government investments. The brokers told the customers that ZCTIs were safe since they were "government backed."

In September of 1985, in an effort to assure compliance with the consent order, the state sent an agent to GIC's Tampa headquarters. While in Tampa, the agent first learned of GIC's offering of the ZCTIs. Kilpatrick explained to the agent that the instruments were backed by $10 to $12 million worth of zero coupon bonds which were kept in the company vault in Olive Branch. On September 23 and 24, the state conducted simultaneous investigations of GIC's Tampa and Olive Branch offices. Instead of finding $10 to $12 million in bonds, as represented by Kilpatrick, state agents discovered a mere $405,000 worth of bonds in Olive Branch to collateralize several million dollars worth of ZCTIs. The state immediately closed GIC, which subsequently filed bankruptcy.

Shortly after the state closed GIC, the federal government arrested appellants Kilpatrick, Brown, Gruber, Anderson and Parker, charging them with conspiracy to commit mail fraud and substantive mail fraud under 18 U.S.C. section 1341.[3] Count I of the indictment alleged that the appellants knowingly and willfully conspired to commit mail fraud. Counts II through IX charged that the appellants devised a scheme to defraud customers of GIC by inducing the customers, through false representations, to invest in the ZCTIs. The indictment charged that the appellants knowingly used the United States Mail to accomplish the scheme.

After a week-long trial, the jury returned guilty verdicts against each appellant on both the conspiracy and mail fraud charges. This appeal challenges the sufficiency of the evidence to support the convictions. In addition, appellants Kilpatrick and Anderson challenge as reversible error the district judge's refusal to instruct the jury that good faith reliance on the advice of counsel is a defense to mail fraud. Finally, Kilpatrick, challenges as reversible error the district court's failure to instruct the jury *sua sponte*, to consider evidence of the consent decree for a limited purpose.

## I. CONSPIRACY

In reviewing the lower court ruling, we must consider the evidence in a light most favorable to the government, drawing all reasonable inferences from the evidence and resolving all credibility choices in favor of the verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Plotke,* 725 F.2d 1303, 1396 (11th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). We will reverse convictions as unsupported by the evidence only if a reasonable mind must entertain reasonable doubt about the guilt of the defendants. *United States v. McCrary,* 699 F.2d 1308, 1311–12 (11th Cir.1983). Upon careful examination of the record below, we find that the evidence does not support the appellants' conspiracy convictions.

To support a conspiracy conviction, the government must prove 1) an agreement to commit an unlawful act and 2) an overt act by one of the conspirators in furtherance of the conspiracy. *United States v. Sawyer,* 799 F.2d 1494, 1401–02 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987); *United States v. Tombrello,* 666 F.2d 485, 490 (11th Cir.1982), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982);

---

3. Section 1341 of Title 18 of the United States Code reads, in pertinent part:
 § 1341 Frauds and swindles
 Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the postal service ... shall be fined not more than $1,000 or imprisoned not more than five years or both.
 18 U.S.C. § 1341.

*United States v. Wieschenberg,* 604 F.2d 326, 331 (5th Cir.1979). The record is void of any expressed agreement between appellants to defraud GIC customers. Conspiracy to defraud, however, "may be inferred from the actions of the actors or by the circumstantial evidence of a scheme." *United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985). The government contends that, even without an expressed agreement to defraud, the evidence supporting a conspiracy conviction is sufficient when it establishes that "all alleged coconspirators directed their efforts toward the accomplishment of a single goal or common purpose." *United States v. Elam,* 678 F.2d 1234, 1245 (5th Cir.1982). The appellants certainly directed their efforts toward the common goal of making money for themselves and their employer. But to support a conspiracy conviction, the evidence must establish a common agreement to violate the law. *Elam,* 678 F.2d at 1245. While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement. Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the convictions cannot stand.

The best evidence the government offers to show a conspiracy to defraud is the presence of all the appellants at the June 14 manager's meeting where Kilpatrick first introduced the ZCTIs. Two government witnesses present at the meeting testified that nothing was said at the meeting that would give rise to suspicion. The record may show that the June 14th meeting was the birthplace of Kilpatrick's fraudulent scheme, but no evidence suggests that the meeting was the birthplace of a conspiracy on the part of the sales brokers to defraud GIC customers.

The government also contends that the appellants had substantial motivation to enter Kilpatrick's fraudulent scheme. The record shows that Kilpatrick alluded to the company's financial troubles at the June 14 meeting. From this evidence, the government argues that the appellants knew GIC was on the verge of insolvency and therefore conspired to commit fraud in order to preserve their jobs. Without more, a rea-

sonable trier of fact could not construe this evidence as sufficient motivation to enter a criminal conspiracy. We therefore reverse the conspiracy convictions of appellant sales brokers.

■ The law is well settled that existence of a coconspirator is not only an element of the crime of conspiracy, but the very essence of the crime. *United States v. Pearson,* 667 F.2d 12, 13 (5th Cir. Unit B 1982). Acquitting appellants Brown, Gruber, Anderson and Parker of conspiracy leaves only "others, both known and unknown" listed in the indictment with whom Kilpatrick could have conspired. Since the record contains insufficient evidence to establish that Kilpatrick schemed with these "other" conspirators to defraud GIC customers, we must also reverse Kilpatrick's conviction on the conspiracy count.

## II. MAIL FRAUD

■ While we find the evidence insufficient to support conspiracy convictions, the question remains whether the record below supports appellants' convictions of mail fraud under 18 U.S.C. section 1341. In reviewing the district court ruling we are reminded of the rule requiring us to view the record in a light most favorable to the government. To convict appellants of mail fraud, the government must prove 1) participation in a scheme to defraud, and 2) that the appellant connected with the scheme used or caused use of the mails in furtherance of the scheme. *United States v. Haimowitz,* 725 F.2d 1561, 1568–69 (11th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *United States v. Hartley,* 678 F.2d 961, 985 (11th Cir.), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1982). As to appellants Brown, Gruber, Anderson, and Parker, we find the evidence insufficient to support the mail fraud convictions. As to appellant Kilpatrick, we find the evidence sufficient to support the jury verdict and therefore affirm his conviction.

### A. Salespersons

As discussed earlier, a scheme to defraud GIC customers is apparent in the record.

GIC faced a serious cash flow problem arising out of the consent decree. To solve the problem, Kilpatrick instructed his brokers to sell ZCTIs which he represented were backed by sufficient zero coupon bonds. Kilpatrick made the same representation to a government agent who was in GIC's Tampa office checking the company's compliance with the consent decree. Of course, the bonds did not come close to covering the investment instruments. Nothing in the record suggests that Kilpatrick was misled or innocently mistaken concerning the amount of bonds in the Olive Branch vault. Furthermore, Kilpatrick used the proceeds from ZCTI sales to meet the company's immediate financial obligations. From this evidence the jury is entitled, if not compelled, to infer a scheme to defraud GIC customers.

The record also clearly indicates that the mails were used to implement the scheme. Every sale mentioned in the indictment was made by phone. After a sale, the broker sent a confirmation notice to the customer, along with a brochure explaining the new investment. Since mailing confirmation notices or letters was an essential part of this scheme, use of the mail was sufficient to bring Kilpatrick's plan within the purview of 18 U.S.C. section 1341. *Haimowitz*, 725 F.2d at 1571.

■ The record below, however, fails to disclose a crucial element of the crime of mail fraud. Unless the appellants intended to defraud GIC customers, the convictions cannot stand. *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980). We have already determined that the record does not show a conspiracy with Kilpatrick to defraud. If, however, appellants joined Kilpatrick's scheme after its inception, they have the criminal intent necessary for conviction under the statute. *United States v. Toney*, 598 F.2d 1349, 1356 (5th Cir.1979),

*cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). The only evidence in the record even remotely suggesting that the salespersons intentionally joined Kilpatrick's scheme is their enormous success at selling ZCTIs. Unindicted in this case are six other GIC salespersons who accounted for 16% of the total ZCTIs sold. The government argues that the appellant salespersons' success as compared to the other brokers was necessarily accomplished by misrepresentations arising out of Kilpatrick's overall scheme. We find that this evidence alone cannot remove all reasonable doubt as to whether the salespersons joined Kilpatrick's plan. The government fails to consider other criteria that may account for the salespersons' success, such as personal skills or motivation. Furthermore, the record contains no evidence that the salespersons at any time discovered or learned of the empty vault in Olive Branch. Without more, the government fails to establish beyond a reasonable doubt that the salespersons joined Kilpatrick's scheme and thus possessed the intent to defraud.

■ The government argues, however, that the failure to check the Olive Branch vault represents a "reckless disregard of the truth" satisfying the intent element of this crime. *See Sawyer*, 799 F.2d at 1502; *United States v. Frick*, 588 F.2d 531, 536 (5th Cir.), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). The government's argument would have merit if the salespersons were under a duty to investigate the backing of the securities they were selling. Nothing in the record suggests such a duty. Common sense dictates that a securities broker cannot be expected to travel to the company vault to make sure his superiors have acquired sufficient collateral to back each investment sold.[4]

---

**4.** In the instant case, we find that the salespersons had no duty to investigate the backing of the securities they sold. In addition, the record is void of any seriously suspicious circumstances that would alert the average broker of potential fraud. In this respect, the instant case differs dramatically from *United States v. Simon, et al.*, 839 F.2d 1461, decided today. In *Simon*, the appellants were selling oil and gas leases

located in Alaska for $10,000, promising customers a virtually risk-free return of several times the initial investment. All of the appellants in *Simon* worked for men whom they knew were involved in prior fraudulent operations. Furthermore, several customers put the appellants in *Simon* on notice of potential fraud by asking about recent newspaper and magazine articles concerning the fraudulent sale of Alas-

Finally, the government intimates that the success at selling ZCTIs is attributed to personal misrepresentations apart from Kilpatrick's overall scheme.[5] In its brief, the government argues that "even if appellants truly were unaware of the absence of ZCTI collateral, it does not follow that their representations to investors were not fraudulent." The government contends that the appellants "represented not merely that the ZCTIs were backed by federally insured bonds, but were themselves so insured." Such a representation, the government contends, is fraudulent regardless of whether sufficient zero coupon bonds exist to collateralize the instruments. Only the zero coupon bonds themselves are actually government insured. Thus, any short term investment that is backed by zero coupon bonds is a "step removed" from actual government insurance. The only party liable on the ZCTIs is GIC, not the federal government. Consequently, the government contends, the ZCTI is much more risky than investments directly insured by the government. Since ZCTIs are a "step removed" from direct government insurance, they are, in the government's words, "only as good as the company issuing them."

 The government's argument is persuasive, but unsupported by the evidence. The record reveals that both appellants Brown and Gruber told their customers that the ZCTIs were "safe investments" that were "backed by the government," but not that the investment was government insured. Similarly, the record shows that appellant Parker told his customers that

ZCTIs were "safe investments" which were "backed by the government" and that the customers had "nothing to worry about." The record does not show that Parker represented the ZCTIs as government insured. Finally, the record shows that appellant Anderson told her clients that the instruments in question were "good investments" which were "backed by the government," but not that the instruments were directly insured by the government. In sum, the record below does not show that the appellant salespersons represented to any person named in the indictment that ZCTIs were government insured.

In oral argument before this court, however, the government strayed from the position taken in its brief. After arguing that the heart of the fraud in this case stems from the representation that ZCTIs were *insured* by the government when they were merely *backed* by government bonds, counsel for the government stated: "If you say this security is backed by the government, you're saying this security is insured by the United States." There seems to be some confusion in the record, in the government's brief, and in oral argument as to whether "backed" or "insured" by the government is a misrepresentation when describing ZCTIs. In oral argument the government eventually, and not surprisingly, took the position that both representations were fraudulent. We disagree. The representation that the instruments in question were "backed by the government" does not supply the criminal intent necessary to uphold appellants' convictions un-

---

kan oil and gas leases. In sum, the evidence in *Simon* was sufficient to allow reasonable jurors to conclude that the appellants turned their backs on the truth in order to sell a product to unsuspecting customers.

**5.** Citing *United States v. Pearlstein*, 576 F.2d 531 (3rd Cir.1978), the appellants contend that, under the circumstances of this case, the court cannot convict them of mail fraud. In *Pearlstein*, a jury convicted salesmen of mail fraud based on misrepresentations concerning a writing pen distributorship. While conceding the existence of an overall scheme to defraud, the salesmen maintained that they were ignorant of the scheme. The Third Circuit reversed their convictions, noting that "although ... a separate

scheme to defraud could have been hatched by these salesmen within the overall scheme, such individual schemes were neither alleged nor proven by the government in this case." *Id.* at 545 (citations omitted).

The salespersons in the instant case maintain that, if they made misrepresentations amounting to fraud, such misrepresentations were no part of Kilpatrick's overall scheme. Consequently, they argue, the court cannot convict them of mail fraud since the indictment charges them with the overall fraud. Since we ultimately find that the appellant-brokers did not intentionally defraud GIC's customers, we need not decide whether the Third Circuit's position in *Pearlstein* applies in this circuit.

der these circumstances. Assuming the ZCTIs were fully collateralized by zero coupon bonds, as represented to the salespersons, the instruments could reasonably be characterized as government backed securities. Whatever may happen to the issuing company, a customer could always fall back on the zero coupon bonds to recover his investment.

Indeed, the government's own witnesses testified that, had the ZCTIs been fully collateralized, they would have been perfectly legal. On cross-examination, Simon Canasi, a securities broker testifying as an expert for the government, said that an investment is as safe as the United States Government "as long as [the] instrument is held in the customer's name and that investment is collateralized by U.S. Government securities." On direct examination, Mr. Canasi expressed concern over a broker who retains collateral on investments. Canasi testified that, if a brokerage house keeps the collateral securing an investment, then the investment is only as safe as the brokerage house itself. Canasi made clear, however, that as long as a firm maintained sufficient security for their investments, the operation would be legal. Similarly, William Reilly of Florida's Bureau of Securities Dealers Examinations testified that ZCTIs were perfectly legal as long as GIC maintained sufficient zero coupon bonds to secure the investments. This testimony makes clear that the fraud in the instant case was not representing ZCTIs as government backed, but rather failing to secure and maintain sufficient backing for the ZCTIs.

Perhaps a better description of the ZCTIs is an investment "collateralized by government bonds" or "backed by government backed bonds." While appellants may have been somewhat loose with their description of the instruments, we find that the characterization of ZCTIs as "government backed" is not wholly unfounded and, under the facts of this case, certainly is not criminal. Therefore, we reverse appellants' convictions on the mail fraud counts. We do not pass upon whether the characterization of ZCTIs as "government insured" might amount to fraud since there is no evidence in the record that the salespersons made such representations.

## B. Kilpatrick

■ The remaining issue we must decide is whether the jury properly convicted Kilpatrick on the substantive mail fraud counts. In his defense Kilpatrick argues first that the evidence presented in the trial below was insufficient to establish that there was a scheme to defraud customers, a necessary element of the crime. We find this contention without merit. The evidence clearly shows that Kilpatrick knew that the ZCTIs were not properly collateralized. Kilpatrick argues, however, that he fully intended to purchase a sufficient amount of bonds to cover the investment. He claims that his understanding was that the bonds were necessary only when the ZCTIs mature, i.e., ninety days after sale. Such an understanding has no basis in logic. There is no reason to purchase collateral to secure an investment after the investment matures. After maturity, the risk inherent in any investment is over. Furthermore, Kilpatrick did not represent to his brokers or to the government agent that the investments would eventually be backed by government bonds; he represented that the ZCTIs were backed by bonds before they were sold.

Kilpatrick next intimates that, when referring to zero coupon bonds, he represented the face value of the bonds and not the market value. The face value of a zero coupon bond is its value in fifteen to thirty years. In the instant case, the actual or market value of the bonds was ten cents on the dollar. Thus, Kilpatrick maintains that his representation that GIC had $10 to $12 million in bonds actually meant that the company had between $1 and $1.2 million in collateral. But GIC brokers sold over $6 million worth of ZCTIs. The record reflects no reason to believe Kilpatrick thought $1.2 million in collateral could secure $6 million in investments.

■ Kilpatrick does not challenge whether he caused use of the mails in his scheme to defraud. In any event, conviction under

this statute does not require that the defendant actually intended to use the mails, but only that he acted with knowledge that the mails would be used in the ordinary course of business. *United States v. Martino,* 648 F.2d 367, 401 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). There is sufficient evidence to allow the jury to conclude that Kilpatrick caused use of the mails or at least reasonably could foresee its use in furthering his scheme. *Martino,* 648 F.2d at 401; *United States v. Georgalis,* 631 F.2d 1199, 1206 (5th Cir.1980).

 In oral argument before this court, counsel for Kilpatrick argued that, if appellant salespersons were acquitted of the mail fraud charges, then we must also acquit Kilpatrick since he was indicted as an aider and abettor to mail fraud. The law is well settled that, while conviction of a principal is not a prerequisite to the conviction of an aider and abettor, the government must nonetheless establish beyond a reasonable doubt that the alleged offense was committed by someone. *United States v. Barfield,* 447 F.2d 85, 89 (5th Cir.1971); *United States v. Merriwether,* 329 F.Supp. 1156, 1159–60 (S.D.Ala.1972), *affirmed,* 469 F.2d 1406 (5th Cir.1972). We have found that the brokers named in the indictment did not commit mail fraud. In the indictment, however, the government did not charge Kilpatrick as an aider and abettor, but as a principal. While the government briefed the case as though Kilpatrick was an aider and abettor, the government, to its advantage, is nonetheless bound by the indictment. The evidence supports Kilpatrick's conviction as a principal.

 Kilpatrick argues, however, that we cannot uphold his conviction as a principal since he had no direct contact with GIC's defrauded customers. His lack of contact with the victims does not insulate

Kilpatrick from criminal liability. Misrepresentation is not an element of the crime with which Kilpatrick is charged. To secure a mail fraud conviction, all the government must prove is 1) the existence of a scheme to defraud, which we find in the record, and 2) use of the mails by the defendant to further the scheme, which also is reflected in the record. *Haimowitz,* 725 F.2d at 1568–69; *Hartley,* 678 F.2d at 985. Therefore, Kilpatrick's conviction may stand regardless of whether he actually made misrepresentations directly to GIC customers.

 Kilpatrick's remaining challenges to the trial below merit little attention. Kilpatrick asserts that the trial judge committed reversible error in failing to instruct the jury that good faith reliance on the advice of counsel is a bar to charges of mail fraud. The record, however, does not reflect a need for the instruction. GIC's attorney told Kilpatrick that the ZCTIs were exempt securities and therefore legal even though not registered. The attorney did not tell Kilpatrick he could sell exempt securities regardless of whether he had sufficient collateral for the securities. Counsel's advice does not concern the matter presented in the indictment.[6] Consequently, we find no error in the trial judge's refusal to grant Kilpatrick's "good faith reliance" instruction. *See United States v. Johnson,* 730 F.2d 683, 686 (11th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 142 (1984).

Finally, Kilpatrick claims the district court committed reversible error in failing to instruct the jury, *sua sponte,* that the court admitted evidence of the consent decree for a limited purpose. *United States v. Cortez,* 757 F.2d 1204, 1207 (11th Cir.), *cert. denied,* 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985). Such omission does not amount to "plain error" resulting in "a

---

**6.** To succeed with a defense of good faith reliance on the advice of counsel, the defendant must show that 1) he fully disclosed all relevant facts to his counsel and 2) he relied in good faith on his counsel's advice. *United States v. Johnson,* 730 F.2d 683, 686 (11th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 142 (1984); *United States v. Smith,* 523 F.2d 771,

778 (5th Cir.1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). The record does not reveal that Kilpatrick told his attorney that Kilpatrick failed to attain sufficient collateral for the instruments his brokers were selling. Therefore, prong one of the "good faith reliance" defense was never satisfied.

miscarriage of justice" in the instant case. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12–13 (1985); *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936).

For the foregoing reasons, we reverse the lower court's convictions of appellants Brown, Gruber, Parker and Anderson on both the conspiracy and fraud counts. We reverse the lower court conviction of Kilpatrick on the conspiracy count and affirm the conviction on the fraud counts.

AFFIRMED in part, REVERSED in part.