UNITED STATES of America, Appellee,

v.

Richard Jerome BEHR, Appellant.

No. 94–1402.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 8, 1994.

Decided Sept. 7, 1994.

Paul C. Engh, Minneapolis, MN, argued, for appellant.

Thorwald H. Anderson, Asst. U.S. Atty., Minneapolis, MN, argued (Paul A. Murphy, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Richard Jerome Behr and three others were indicted on multiple counts of conspiracy to commit mail fraud and aiding and abetting mail fraud. The other persons indicted along with Behr, Douglas Novak, Gregory Novak, and Michael Comins, pleaded guilty to mail fraud.[1] Behr tried his case to a jury and was convicted on twenty-three counts of mail fraud and one count of conspiracy. The district court sentenced him to fifteen months imprisonment. On appeal, Behr argues that (1) the evidence was insufficient to sustain his conviction of aiding and abetting mail fraud and conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, and 18 U.S.C. § 371, respectively; (2) the district court erred in denying him a two-level reduction for acceptance of responsibility; and (3) the district court erred in denying him a four-level reduction for his role in the offense. We affirm on all issues.

## I.

Behr was a highly successful sales representative at Novak Telecommunications, Inc. ("NTI"), a California-based company with offices in Minnesota that sold pay telephones as investments to the general public. During his eighteen months at NTI,[2] he received $197,000 in compensation[3] which was partly derived from commission he received from the sales of pay phones to twenty-eight investors.[4] The company operated by locating high traffic sites, such as bars and truck stops, and entering into "Royalty Agreements" with the owners of the locations under which the owners would receive a percentage of the income of the pay phone. Behr and other NTI sales representatives then sold the phones to investors, who were assured of a truly remarkable rate of return—up to 30 to 35 percent, leading to a recapture of their investment within three years.[5] Each phone sold for $4,530 with a discount for multiple phone purchases.

Once an investor decided to purchase a telephone, NTI sent documents to the investor via U.S. mail. Subsequently, NTI sent a courier or the salesperson to pick up the purchase agreements and payments for the phones. The investor's copies of the relevant documents were returned through the mail. If a phone was purchased mid-month, income checks were promptly sent to the investor for

---

1. Douglas and Gregory Novak were sentenced to twenty-one months and thirty-three months imprisonment, respectively. Michael Comins was sentenced to eighteen months imprisonment.

2. Behr worked for NTI from the spring of 1989 to October 1990.

3. This amount consisted of approximately $124,000 in salary and commissions, and approximately $68,000 in bonus telephones. Appellee's Br. at 4. Behr received sixteen bonus phones— one for every $50,000 in gross sales to investors, or about $800,000 in sales. *Id.* at n. 4.

4. The investors to whom Behr sold phones paid a total of $930,000 for their phones and collectively received payments of $96,000. Their resulting net loss was $833,000. Appellee's Br. at 5.

5. Investors were informed that the potential revenue from each telephone was approximately $300 to $400 per month. Based on that total, investors could expect as much as $140 per month in net revenue.

the balance of that month.[6] The checks would continue for the initial months of the contract, thus allowing an investor to calculate the return at or near the promised rate. The initial prompt payment by NTI and the high rate of return on the investment encouraged many investors to buy additional telephones, often at discounted rates.

The investors' honeymoon ended soon after they received their first few income checks. Investors were eventually cut off from all contact with NTI; they stopped receiving income checks, and their phone calls to NTI about missing payments and other concerns were not returned.

Behr readily concedes that NTI's business dealings were shaky. According to him, the company "rose up with high expectations but without a business foundation. The rate of return promised had no basis in reality...." Appellant's Br. at 10. He admits that NTI "was receiving money from phones, while completely ignoring the investor," *id.* 12–13, and that the company made its sizable profit by "selling phones that didn't exist, or double selling phones to different people." *Id.* at 13. Notwithstanding this, he maintains he had no involvement in the scheme masterminded by NTI's partners to defraud investors and therefore did not have the requisite intent to defraud. Rather, he argues that he was an unwitting participant in an enterprise whose less-than-scrupulous business dealings are solely attributable to its principal partners. *Id.* at 30.

■ The evidence was more than sufficient, we believe, to support the finding that Behr had the requisite intent to defraud. To be convicted of mail fraud under 18 U.S.C. § 1341, a defendant must have used the United States mails to "devise[ ] or intend[ ] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representa-

tions, or promises...." The government must prove beyond a reasonable doubt that the defendant acted with intent to defraud. *United States v. Bassler,* 651 F.2d 600, 604 (8th Cir.), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 305 (1981). Direct evidence of intent, however, is not required; the requisite intent may be inferred from all the facts and circumstances surrounding the defendant's actions. *Id.* A scheme to defraud is generally one which is reasonably calculated to deceive persons of ordinary prudence and comprehension. *United States v. Ammons,* 464 F.2d 414, 417 (8th Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972).

In reviewing the sufficiency of the evidence, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict. *United States v. Plenty Arrows,* 946 F.2d 62, 64 (8th Cir.1991); *see also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We will not overturn a verdict unless the evidence is such that a reasonable juror must have a reasonable doubt regarding the existence of one of the essential elements of the crime. *United States v. Beard,* 996 F.2d 934, 936 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 414, 126 L.Ed.2d 361 (1993).

It is true that Behr had little to do with the day-to-day operations of the company, *e.g.,* signing checks, handling accounting matters, locating sites. He was, however, a potent player in the sales end of the operation. The record clearly shows that he was acutely aware of the inability of NTI to pay investors and, in fact, encouraged them to continue investing even when he knew that NTI had stopped sending income checks and that the enterprise "was basically coming apart."[7] V Tr. at 521.

---

6. If, for example, a phone was purchased on the fifteenth, the investor would receive a check covering the anticipated return through the thirty-first of the month.

7. We note that the court properly instructed the jury on the good faith defense, upon which Behr relied at trial. The jury was instructed as follows:

The good faith of a defendant is a complete defense to the charges of conspiracy and mail fraud contained in the indictment because good faith on the part of the defendant is, simply, inconsistent with the intent to defraud alleged.

A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely

Perhaps most telling of Behr's intent to defraud are his multiple sales of the same phones to different investors and his gross misrepresentations. Between August and September 1990, Behr sold the same telephone (located at John's Superette near Glendale, California) to five different investors. Appellee's Br. at 10–14, 33. He made other multiple sales of phones to unsuspecting investors, most of whom stopped receiving income checks shortly after investing with NTI and some of whom who were not paid at all. *Id.* at 14, 21, 26.

Behr's misrepresentations are evidenced by one particularly troubling incident in which he sought to sell a large number of phones that he knew did not exist. Within months of starting work, he offered to sell one investor, Richard Andren, several of what he represented to be forty phones at the Petrol Pumper, a truck stop near Inver Grove Heights, Minnesota. *Id.* at 6. Andren visited the location and discovered that the truck stop was closed and that there was only one phone at a nearby cafe. He reported this to Behr.[8] *Id.* Two months later, Behr sold $20,000 worth of telephones at the same location to another investor, Richard Stokes, in spite of having been notified by Andren that the site was closed. VI Tr. at 390. Behr told Stokes that the Petrol Pumper was a good location and that it would "pay out over the long haul." *Id.* at 391.

Behr relies on *United States v. Parker*, 839 F.2d 1473 (11th Cir.1988), as support for his position that there was insufficient evidence of his intent to defraud. We find *Parker* distinguishable from the present case. In *Parker*, the Eleventh Circuit held that the evidence was insufficient to support the defendants' convictions of mail fraud because the defendants, security brokers for a licensed security dealer, were not alerted to any unusual circumstances surrounding their sale of short-term investments their employer assured them were adequately collateralized. *Id.* at 1479. Specifically, the court held that the defendants had no duty to investigate the backing of the securities, because "[c]ommon sense dictates that a securities broker cannot be expected to travel to the company vault to make sure his superiors have acquired sufficient collateral to back each investment sold." *Id.*

*Parker*, as we read it, does not stand for the proposition that a salesperson working under the direction of higher-up operatives is absolved in every instance of the responsibility of investigating the nature of a product he is selling. Rather, we read the case to mean that *in the absence of suspicious circumstances* that would alert the average person of potential wrongdoing, a salesperson has not acted fraudulently. *Id.* at 1479 n. 4. There is ample evidence of suspicious circumstances in the instant case to put a reasonable person on notice of potential fraud.

## II.

We next turn to the two sentencing issues that Behr raises, neither of which we believe has merit. Behr first argues that the district court erred in declining to give him a two-level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. A decision by a district court as to whether a defendant has accepted responsibility is largely a factual question that turns on issues of credibility. *United States v. Adipietro*, 983 F.2d 1468,

---

because the belief or opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or an error in management does not rise to the level of intent to defraud.

A defendant does not act in "good faith" if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent pretenses, representations, or promises to others.

The mail fraud statute is written to subject to criminal punishment only those people who knowingly defraud or attempt to defraud.

While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

In determining whether or not the government has proven that the defendant acted with an intent to defraud or whether the defendant acted in good faith, the jury must consider all of the evidence in the case bearing on the defendat's [sic] state of mind.
Jury Instruction No. 25.

8. Upon being informed of the closing, Behr simply offered to sell Andren other phones at another location. Appellee's Br. at 6.

1474 (8th Cir.1993); *United States v. Evidente,* 894 F.2d 1000, 1002 (8th Cir.), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). A district court's decision on this issue will be reversed on appeal only if clearly erroneous. *United States v. Miller,* 951 F.2d 164, 165 (8th Cir.1991). The district judge found that Behr at no time admitted that any of his actions were wrong, and we see no reason to question this finding. Accordingly, we find that the district court did not err in declining to give Behr a reduction for acceptance of responsibility.

Second, Behr argues that the district court erred in not discounting four offense levels for his minimal role in the crime pursuant to U.S.S.G. § 3B1.2. Whether a defendant's role in the offense was "minor" (entitling him to a two-level reduction), "minimal" (entitling him to a four-level reduction), or somewhere in between (entitling him to a three-level reduction), is a factual determination to be made by the district judge. *United States v. Ellis,* 890 F.2d 1040, 1041 (8th Cir.1989) (per curiam); *see* U.S.S.G. § 3B1.2. We will not disturb the district court's finding unless it is clearly erroneous. *Ellis,* 890 F.2d at 1041. We find no error in the district judge's decision to award Behr a three-level, instead of a four-level, reduction for his minimal role in the offense.

In conclusion, we find that the evidence was sufficient to support the jury's finding that Behr had the requisite intent to defraud, that the district court did not err in refusing to depart downward for acceptance of responsibility, and that the district court properly granted Behr a three-level reduction for his role in the offense.