United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3003

_____

United States of America,      *
       *
     Appellee,      *
       *    Appeals from the United States
     v.      *    District Court for the Eastern
       *    District of Missouri.
Arthur A. Blumeyer, III,      *
       *
     Appellant.      *

_____

No. 96-3102

_____

United States of America,      *
       *
     Appellee,      *
       *
     v.      *
       *
John W. Peckham, Jr.,      *
       *
     Appellant.      *

_____

Submitted: April 14, 1997
Filed: June 2, 1997

_____

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

BOWMAN, Circuit Judge.

Arthur Blumeyer and John Peckham appeal their convictions and sentences in this complicated case involving mail fraud, wire fraud, conspiracy, and money laundering in the insurance industry. We affirm the judgments of the District Court.[1]

**I.**

Viewed in the light most favorable to the verdicts, the record reveals the following facts. Blumeyer owned and operated several insurance companies, including Bel-Aire Insurance Company, a Missouri corporation (Bel-Aire); Atlantic General Insurance Company Limited, originally known as U.S. Reinsurance Company, a company incorporated on the island of Anguilla in the British Virgin Islands (Atlantic General); and Atlantic General and Specialty Insurance Company Limited, later known as Marigot Casualty Company Limited, also an Anguillan corporation (Atlantic General and Specialty). Blumeyer concealed his interest in Atlantic General by placing his ownership in the name of two nominees. In addition, Blumeyer owned and operated a number of insurance-related businesses that were affiliated with Bel-Aire, and he and his wife owned a personal holding company.

Blumeyer incorporated Bel-Aire in February 1987 and applied to the Missouri Division of Insurance, later known as the Missouri Department of Insurance (MDI), for a Certificate of Authority to sell property and casualty insurance. At the time, the state required a start-up company such as Bel-Aire to have $800,000 in unencumbered capital. During a pre-licensing audit of Bel-Aire conducted by an MDI examiner, Blumeyer represented that his new company owned $400,000 in Treasury bonds and a $500,000 certificate of deposit. He did not disclose that all of these assets were fully encumbered, nor did he disclose that the certificate of deposit had not yet been

---

[1]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

purchased. (He presented the examiner with a letter from a bank purporting to state that Bel-Aire owned such a CD.) Based on this examination, the MDI issued Bel-Aire a Certificate of Authority in May 1987.

Peckham, who had had a long career in the insurance industry, joined one of Bel-Aire's affiliates the next month and took charge of marketing. His job soon expanded to include legislative and regulatory compliance work.

The MDI became suspicious of Bel-Aire not long after its certification when insurance commissioners from other states suggested possible problems with the company to Missouri's commissioner. The MDI ordered another audit of Bel-Aire, which was coordinated by Mark Stalhuth, the assistant general counsel of the MDI, in October 1987. This audit disclosed the encumbrance of Bel-Aire's startup capital and revealed that Blumeyer had replaced Bel-Aire's $500,000 CD with a promissory note from himself. Although this note purported to be secured by Treasury notes, CDs, and corporate stock as of September 30, 1987, the examiner discovered that the Treasury notes and CDs had not been purchased until late October. (It was later determined that the Treasury notes and CDs were purchased with borrowed funds and that the corporate stock was worthless because the corporation did not exist on September 30, 1987.) Based on the audit findings, which included other problems not mentioned here, the MDI brought charges against Bel-Aire in November 1987. The parties settled the dispute the next month when Bel-Aire agreed to redeem Blumeyer's promissory note and remove the encumbrance from the original Treasury bonds. The MDI issued a press release stating that Bel-Aire was a viable insurance company with which it was safe to do business.

In late December 1987, Peckham wrote a memorandum to Blumeyer regarding Dewey Crump, a member of Bel-Aire's board of directors. Crump was at the time a Missouri state representative and chairman of the House Insurance Committee. Peckham's memorandum requested $475 per month to cover Crump's expenses for an

apartment, utilities, and furniture rental. Blumeyer's secretary attached a note to the memorandum that read, "John, Art said $400 per month for Dewey." Tr. at 1286. Crump was also on the payroll of one of Bel-Aire's affiliates at a salary of approximately $55,000 per year--which he did not report in financial disclosure statements--and had a company credit card, even though he apparently did no work for the company. (Crump testified that he organized social and charitable events for legislators and staff on behalf of Blumeyer's companies.) Blumeyer and Peckham addressed considerable correspondence to Crump regarding insurance bills in the Missouri legislature. In February 1988, the House Appropriations Committee deleted from the MDI's appropriation bill an amount corresponding to the salary of Mark Stalhuth, the attorney responsible for the autumn 1987 audit of Bel-Aire. When the MDI's commissioner investigated, the chairman of the Appropriations Committee suggested that Stalhuth had made some enemies. The commissioner then spoke to Crump, who agreed to restore the funding if the MDI increased the salary of his uncle (an MDI employee) and hired another individual as an examiner. When the MDI complied, the funding for Stalhuth's position was restored.

Crump also sponsored a 1989 legislative amendment that would have made it easier for Bel-Aire to meet the MDI's capital requirements, and he introduced a bill in 1990 that would have altered the requirements of Stalhuth's position so that Stalhuth would not have qualified for the job. In addition, Crump spoke to MDI examiners during a 1989 audit of Bel-Aire, mentioning a recently enacted statute that had raised their salaries and commenting that Blumeyer was a good businessman.

The record is replete with questionable maneuvers involving the assets of Bel-Aire and Atlantic General. We will report only a few of these transactions here. Bel-Aire's financial report for the period ending September 30, 1988 included as an asset a surplus note in the amount of $2 million, payable to "Atlantic General Insurance Company." A surplus note represents an infusion of assets into an insurance company that is to be repaid only out of the company's surplus and only with the MDI's approval;

because of these contingencies, a company is not required to show a corresponding liability on its financial statements. At the time the note was executed, however, Atlantic General did not exist; the Anguillan company that would eventually adopt the name "Atlantic General" was still known as U.S. Reinsurance Company. In his efforts to gain the MDI's approval of the note, Blumeyer represented that Atlantic General was a California insurance company.

In late 1989, Roy Thigpen, the owner of a foundering Wyoming insurance company, transferred a number of lots of real property in Arizona to Blumeyer. Thigpen had previously offered the lots to the receiver of his insurance company in Wyoming, but the receiver rejected them as worthless because of back taxes owed on them. Blumeyer certified to the Arizona tax authorities that he purchased the lots for $385,000, but after Thigpen arranged for a "friendly" appraisal of the lots for $3 million, the lots appeared on Bel-Aire's 1989 year-end financial statement as collateral for receivables and loans. When Bel-Aire's chief accountant refused to sign this financial statement, Peckham signed it instead.

Blumeyer and Peckham also worked with Thigpen to create fraudulent financial statements for Atlantic General, which figured more prominently in the defendants' plans after California ordered Bel-Aire to cease and desist marketing insurance in that state. Peckham suggested using Atlantic General as a means of pursuing sales in California instead. (Thigpen was interested because he planned to use Atlantic General to prop up his failing company in Wyoming.) Although Atlantic General's in-house balance sheet as of the end of 1989 showed assets of approximately $178,000 and liabilities of approximately $250,000, Thigpen and Peckham produced a financial statement showing assets of $12.8 million and liabilities of $4.4 million. Peckham coordinated the effort to provide fraudulent documentation of Atlantic General's assets to a certified public accountant in Texas in order to persuade the accountant to certify the financial statement. Preliminary and certified statements were sent to a sponsoring

broker in California, even though the accountant withdrew his certification a week after he issued it. That broker wrote insurance for Atlantic General in California.

Finally, we consider the crown jewel of the defendants' shenanigans, known in this case as the "swirl" transaction. In an effort to prop up Bel-Aire's financial statement for the period ending March 31, 1990, Blumeyer transferred $2.25 million in liabilities and $2.3 million in cash from Bel-Aire to Atlantic General, purportedly as a reinsurance or indemnity transaction. Blumeyer then withdrew $2.275 million in cash from Atlantic General, leaving an unsecured personal promissory note in its place, and funneled it back into Bel-Aire via one of the affiliates. The net effect of the transaction was to decrease Bel-Aire's liabilities and to shore up its assets, while at the same time transferring risk to Atlantic General, a company that was left with no assets with which to cover the risk. This maneuver escaped detection temporarily because Blumeyer's interest in Atlantic General remained in the hands of nominees.

As the MDI and other state authorities began closing in, Blumeyer began to launder money offshore. Near the end of the summer of 1990, he ordered $400,000 from an Atlantic General brokerage account in St. Louis transferred to the Bank of Nova Scotia in Anguilla. At about the same time, he transferred $400,000 from brokerage accounts in St. Louis belonging to two Bel-Aire affiliates to a bank in Denver, and then later to a bank in Panama. Of this $800,000, the government was able to determine that $225,000 eventually ended up in the hands of either Blumeyer or his personal holding company. During the relatively short life of Bel-Aire, Blumeyer received salaries, advances, and other benefits of more than $4 million from his companies.

The defendants' venture collapsed in the summer and autumn of 1990. The MDI served conservatorship papers on Bel-Aire in June 1990. When the subsequent audit disclosed a number of problems, the MDI commenced a case against Bel-Aire, its affiliates, and Atlantic General in state court on October 3, 1990. The state judge

immediately issued an order appointing the director of the MDI as temporary receiver of Bel-Aire and several of the affiliates, enjoining Bel-Aire's officers from conducting business without the MDI's permission, and enjoining all of the defendant companies from disposing of Bel-Aire's property. Although Blumeyer and Peckham were locked out of their offices, Blumeyer telephoned his secretary, who was still permitted on the premises, and instructed her to destroy files relating to Thigpen and Atlantic General, among others. Blumeyer also continued to operate Atlantic General and Specialty, which he had recently incorporated and which was not seized by the MDI, and he contacted Thigpen (who was by then headed to prison) for help in establishing phony assets for that company.

The state court ordered Bel-Aire liquidated in July 1993. At the sentencing hearing in this case in July 1996, the receiver-liquidator reported that Bel-Aire had about $2 million in assets with which to pay claims totaling more than $90 million.

Blumeyer and Peckham were indicted in March 1993, along with Crump, Marvin Lewis, and W.G. King.[2] Each defendant was charged with sixteen counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (1988 & Supp. II 1990), six counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 (1988 & Supp. II 1990), and one count of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 371 (1988). In addition, Blumeyer was charged with seven counts of conducting a financial transaction involving the proceeds of a specified unlawful activity, in violation of 18 U.S.C. § 1956(a) (1988), and two counts of knowingly engaging in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1957 (1988). All of the charges against King and one of the money-laundering charges against Blumeyer

---

[2]Lewis, a former attorney from Texas, was charged with participating in the process of establishing phony assets of Bel-Aire and Atlantic General. King, the president of a bank branch in St. Louis County, was charged with arranging banking transactions for Blumeyer in connection with the startup and the autumn 1987 audit of Bel-Aire.

were dismissed before trial. Following a month-long trial in early 1994, a jury convicted Blumeyer of fifteen counts of wire fraud, six counts of mail fraud, the conspiracy count, and five counts of money laundering; he was acquitted on the remaining four counts. Peckham was convicted of one count of wire fraud, four counts of mail fraud, and the conspiracy count and acquitted on the other charges against him. Crump and Lewis were acquitted on all counts.

Blumeyer and Peckham filed motions for a new trial, alleging juror misconduct. After a series of hearings, the District Court granted the motions and ordered a new trial. The government appealed, and we reversed, reinstated the verdicts, and remanded for sentencing. See United States v. Blumeyer, 62 F.3d 1013 (8th Cir. 1995), cert. denied, 116 S. Ct. 1263 (1996). On remand, the District Court sentenced Blumeyer to 262 months' imprisonment and Peckham to 37 months' imprisonment, to be followed by a two-year term of supervised release for each defendant. Both defendants now appeal their convictions and sentences.[3]

---

[3]Since filing this appeal, Blumeyer has filed a motion for release pending appeal, a motion for immediate release and other relief, and a motion to preclude the government from participating in oral argument, all of which we denied. Blumeyer then returned to the District Court, seeking a writ of habeas corpus on the theory that our denial of his motions without a statement of the reasons therefor violated his statutory and constitutional rights. The District Court denied relief, concluding that Blumeyer was actually asking the District Court to review a decision of the Court of Appeals. Blumeyer appealed that decision and moved to disqualify three particular judges of this Court from hearing that appeal because he believed they were the judges who denied his earlier motions. We denied Blumeyer's disqualification motion and summarily affirmed the District Court's denial of habeas corpus relief. Blumeyer, proceeding pro se at this point, currently has a petition for extraordinary relief pending before Justice Thomas in the Supreme Court.

## II.

Blumeyer and Peckham raise a number of legal challenges to their fraud convictions. To set the scene for these arguments, we quote the operative provision of the indictment, which charged that the defendants

> willfully and knowingly devised and intended to devise a scheme and artifice: (1) to defraud policyholders, potential policyholders and brokers of Bel-Aire, Atlantic General, Atlantic General and Specialty, and Marigot, (2) to defraud the citizens of the State of Missouri of their right to the honest and faithful services of an elected official, and (3) to obtain money and property by means of false and fraudulent pretenses, representations and promises, knowing the same would be and were false and fraudulent when made.

Indictment at 5-6. Portions of the defendants' arguments incorporate challenges to the sufficiency of the evidence to support their convictions. Where the sufficiency of the evidence is implicated, we consider the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and we will reverse only if no reasonable jury could have found the defendants guilty beyond a reasonable doubt. See United States v. Stands, 105 F.3d 1565, 1570 (8th Cir. 1997).

## A.

We begin with the defendants' arguments that they cannot be found guilty of defrauding citizens of their right to the honest and faithful services of Crump. We note first that Crump's acquittal has no bearing on the liability of Blumeyer or Peckham. Crump may have been acquitted for lack of fraudulent intent, for lack of a sufficient nexus to the mailings and wire transactions charged in the indictment, or for any number of other reasons, but a general verdict of acquittal for Crump does not mean

-9-

that Blumeyer and Peckham did not participate in a scheme to deprive Missourians of Crump's honest services.

The defendants rely on the Supreme Court's decision in McNally v. United States, 483 U.S. 350, 356 (1987), which held that the mail fraud statute[4] was limited to the protection of property rights and did not extend to the protection of the intangible right to honest government. Congress responded to McNally in 1988 by enacting § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346 (1988). We have previously recognized that "[s]ection 1346 was enacted . . . to overrule the Supreme Court's decision in McNally" and that it restored the "vitality" of our pre-McNally cases involving official corruption. United States v. Jain, 93 F.3d 436, 441-42 (8th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3531 (U.S. Jan. 17, 1997) (No. 96-1167). Accordingly, we decline the defendants' suggestion that we should adopt the reasoning of the Fifth Circuit in United States v. Brumley, 79 F.3d 1430, 1440 (5th Cir.), reh'g en banc granted, 91 F.3d 676 (5th Cir. 1996), which holds that § 1346 was ineffective to overturn the holding of McNally.[5]

_____

[4]In pertinent part, the statute provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used], shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341 (1988). The wire fraud statute is identical in all relevant respects. See 18 U.S.C. § 1343 (1988).

[5]Indeed, we have little difficulty rejecting outright the following reasoning of the Fifth Circuit:

[W]e know of no principle of constitutional law which contemplates that the Congress can by simple legislative fiat overrule, overturn, nullify or render ineffective a decision of the Supreme Court. Any such process would be a serious breach of the separation of powers doctrine inherent

-10-

The defendants also suggest that because the scheme alleged in this case includes activities undertaken before the effective date of § 1346 (November 18, 1988), their convictions are invalid. We have held in a similar case, however, that conducting a scheme to defraud is a continuing offense, and applying § 1346 to a scheme that spanned the date of enactment of that statute poses no ex post facto difficulty. See United States v. Garfinkel, 29 F.3d 1253, 1259 (8th Cir. 1994). In any event, the District Court's instructions limited the jury to considering events occurring after November 18, 1988.

Finally, the defendants argue that their convictions cannot stand even under our pre-McNally jurisprudence. We disagree. In United States v. McNeive, 536 F.2d 1245 (8th Cir. 1976), one of the cases on which the defendants rely, McNeive, a city plumbing inspector, accepted gratuities that a contractor sent to him with each permit application. The record revealed that McNeive's duty to approve permits was ministerial, not discretionary; the city received the full fee for each permit application; McNeive enforced the plumbing code effectively; and he did not solicit gratuities or attempt to conceal or misrepresent his acceptance of them. We concluded that McNeive had not engaged in a scheme to defraud the city of anything. See id. at 1252. The instant case is quite easily distinguishable: Crump's position as a state legislator involved significant discretion, and the jury reasonably could have concluded that the defendants schemed to deprive Missourians of his honest services by appropriating his discretion for the benefit of Bel-Aire, a company in which he concealed his interest.

---

in our Constitution.

Brumley, 79 F.3d at 1437. Congress, of course, overturns Supreme Court decisions in statutory cases with some frequency. See Landgraf v. USI Film Products, 511 U.S. 244, 250-51 (1994) (identifying eight Supreme Court decisions modified or overturned by Civil Rights Act of 1991); West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 113-15 (1991) (Stevens, J., dissenting) (listing several Supreme Court decisions, including McNally, subsequently overturned by Congress).

It is irrelevant that many of Crump's legislative efforts on behalf of Bel-Aire were not enacted into law in the language proffered by him. The defendants cite <u>United States v. Rabbitt</u>, 583 F.2d 1014, 1024-26 (8th Cir. 1978), <u>cert. denied</u>, 439 U.S. 1116 (1979), in which we reversed several of Rabbitt's convictions because there was no evidence of a tangible or intangible loss to the public. But they ignore another portion of that opinion, in which we affirmed Rabbitt's mail-fraud conviction for accepting a bribe to help insure the passage of a bill, even though the bill was subsequently vetoed by the governor and did not become law. <u>See</u> <u>id.</u> at 1019-23. The reasoning is simple: the public's right to the honest services of a public officer is violated when the officer uses a public position to pursue dishonest ends, not merely when the officer achieves a dishonest goal.

## B.

The defendants also raise legal challenges to the other aspects of the fraud charges, namely those aspects of the scheme that involved defrauding policyholders and brokers and obtaining money and property by false and fraudulent pretenses. They argue first that this case is really all about licensing and that depriving the state of a Certificate of Authority does not constitute mail fraud, citing <u>United States v. Granberry</u>, 908 F.2d 278 (8th Cir. 1990), <u>cert. denied</u>, 500 U.S. 921 (1991). <u>Granberry</u> held that an allegation that a defendant obtained a governmental license or permit fraudulently, without more, did not state a mail-fraud offense. <u>See</u> <u>id.</u> at 280. Try as they might, however, the defendants cannot turn this case into <u>Granberry</u>. The indictment quite clearly states that the fraud involved here is fraud on policyholders and brokers, not fraud on the MDI. Naturally, the evidence focused on the fraudulent representations made by the defendants to the MDI, for without a certificate, the defendants could not have operated Bel-Aire in such a way as to defraud policyholders and brokers. (In fact, they could not have operated the company at all.) But <u>Granberry</u> does not mean that any scheme that involves the fraudulent procurement of a license as a means of defrauding some other person is beyond the reach of § 1341. We

recognized as much in <u>Granberry</u> itself:  while we affirmed the dismissal of allegations that Granberry defrauded the state when he fraudulently obtained a license to operate a school bus, we reinstated allegations that he defrauded a school district when he used the fraudulent license to obtain a job as a bus driver.  <u>See</u> <u>id.</u> at 280-81.  The same reasoning holds here.  Obtaining a certificate from the MDI by means of fraud did not necessarily constitute mail fraud, but Blumeyer and Peckham came within the reach of the law when they operated their fraudulently certified business so as to defraud policyholders and brokers.  <u>See</u> <u>United States v. Brownlee</u>, 890 F.2d 1036, 1037-38 (8th Cir. 1989) (affirming convictions for defrauding insurance companies and automobile owners where part of scheme involved obtaining fraudulent titles from state); <u>United States v. Paccione</u>, 949 F.2d 1183, 1193-94, 1197 (2d Cir. 1991) (affirming convictions for defrauding city of funds and waste producers of services where part of scheme involved obtaining fraudulent waste permits from city and state), <u>cert. denied</u>, 505 U.S. 1220 (1992).

The defendants also challenge the intent element of their convictions, arguing that the government never proved that they intended not to provide insurance to the policyholders of Bel-Aire and the other companies.[6]  Intent to defraud is an element of mail fraud and wire fraud.  <u>See</u> <u>United States v. Manzer</u>, 69 F.3d 222, 226 (8th Cir. 1995).  But, contrary to the defendants' suggestions, the government need not prove intent directly; the jury may infer intent to defraud from circumstantial evidence.  <u>See</u> <u>United States v. Behr</u>, 33 F.3d 1033, 1035 (8th Cir. 1994); <u>United States v. Clausen</u>, 792 F.2d 102, 105 (8th Cir.), <u>cert. denied</u>, 479 U.S. 858 (1986).  We believe the jury quite reasonably could have concluded that the defendants, by marketing and selling

---

[6]At times, the defendants also seem to be arguing that there was no proof that any policyholder was actually deprived of insurance, since the evidence of Bel-Aire's ultimate financial condition was introduced only at sentencing.  This argument is irrelevant, for criminal liability need not rest on the actual defrauding of any victim; it may be the operation of the scheme (combined with the mailing or wire transmission) that constitutes the crime.  <u>See</u> <u>Jain</u>, 93 F.3d at 441.

-14-

insurance through companies that were organized and perpetuated fraudulently, intended to defraud the brokers and policyholders who came into contact with their companies. See, e.g., Behr, 33 F.3d at 1035-36 (upholding conviction of salesman who did not run company but continued to solicit investors when he knew company had stopped sending checks to earlier investors).

Finally, Blumeyer and Peckham take aim at the prong of the indictment relating to misrepresentations. They suggest that there is no proof that any policyholder or potential policyholder ever saw Bel-Aire's fraudulent financial statements. Whether a defendant may be convicted of mail fraud or wire fraud for making false representations only to persons other than the intended victims of the scheme is a difficult question, and one on which the case law does not admit of easy reconciliation. Compare United States v. Lew, 875 F.2d 219, 221 (9th Cir. 1989) (reversing conviction where only misrepresentations were to government and alleged victims were not deceived in any way); United States v. Evans, 844 F.2d 36, 39 (2d Cir. 1988) (suggesting that misrepresentations must be made to the party deceived) (dictum); McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 794 (1st Cir.) (affirming dismissal of civil RICO action where only misrepresentations were to trade associations and plaintiff was not deceived), cert. denied, 498 U.S. 992 (1990) with United States v. Cosentino, 869 F.2d 301, 307 (7th Cir.) (affirming convictions where defendants made false representations to state insurance officials to enable themselves to continue defrauding their insurance company and policyholders), cert. denied, 492 U.S. 908 (1989).[7] We believe that the Seventh Circuit has the better argument: a defendant who makes false representations to a regulatory agency in order to forestall regulatory action

_____

[7]Courts also have upheld convictions in similar cases where this issue has not been addressed specifically. See Schmuck v. United States, 489 U.S. 705, 707 (1989) (affirming conviction of auto distributor who rolled back odometers and sold cars to dealers but had no contact with ultimate customers); United States v. Bishop, 825 F.2d 1278, 1279-80 (8th Cir. 1987) (affirming convictions of defendants who did not themselves misrepresent anything to defrauded secured creditors).

that threatens to impede the defendant's scheme to obtain money or property from others is guilty of conducting a "scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1341 (1988); see also United States v. Bailey, 859 F.2d 1265, 1277-78 & n.3 (7th Cir. 1988), cert. denied, 488 U.S. 1010 (1989).

But even if the defendants are correct, it is clear from the record that at least one broker received an Atlantic General financial statement and used it to qualify to market insurance in California, and Bel-Aire's filings were public documents on which the MDI relied to answer questions from the public.  The jury reasonably could have concluded that the defendants made false representations directly to at least one broker and indirectly to policyholders and potential policyholders.

## C.

Peckham suggests that this prosecution is barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011-1015 (1988).  We disagree.  We note first that Peckham failed to raise this argument for more than three years after he was indicted.  Peckham thus waived this argument, for the McCarran-Ferguson objection is not jurisdictional.  See United States v. Cavin, 39 F.3d 1299, 1305 (5th Cir. 1994); Dexter v. Equitable Life Assurance Soc'y, 527 F.2d 233, 236-37 (2d Cir. 1975).

We will nevertheless consider the claim, albeit briefly, in order to demonstrate that it is incorrect.  We have recently stated in dicta that "[o]bviously, the federal government may prosecute mail and wire fraud committed upon state insurance regulators, and other criminal exploitation of an insurance company."  United States v. Riley, 78 F.3d 367, 371 n.5 (8th Cir. 1996).  Other circuits have so held explicitly.  See Cavin, 39 F.3d at 1305; United States v. Sylvanus, 192 F.2d 96, 100 (7th Cir. 1951), cert. denied, 342 U.S. 943 (1952).  The flaw in Peckham's argument is that a criminal

-16-

prosecution of an insurance company officer for fraud does not "invalidate, impair, or supersede any law" enacted by the state. 15 U.S.C. § 1012(b) (1988).

Our recent decision in Doe v. Norwest Bank Minn., N.A., 107 F.3d 1297 (8th Cir. 1997), is not to the contrary. In Doe, we held that a civil RICO claim against an insurance company that was premised in part on allegations of mail fraud was barred by the McCarran-Ferguson Act. See id. at 1307-08. Our holding was based on the potential havoc that a civil RICO claim, with its severe remedies, could wreak on the state's carefully considered mechanism for regulating insurance companies. See id. In the instant case, the prosecution of Blumeyer and Peckham will not disturb the MDI's regulatory processes at all, especially considering that the MDI has barred the defendants from having anything more to do with Bel-Aire. And our particular concern in Doe--that wronged policyholders would turn to RICO suits instead of pursuing administrative channels of relief, see id. at 1306-07--is simply inapplicable here, for private parties are not empowered to bring criminal fraud charges. We conclude that Peckham's contention is meritless.

### D.

Blumeyer argues that because his money-laundering convictions are premised on the unlawful activities of mail fraud and wire fraud and because he is not guilty of fraud, his laundering convictions must be reversed. Having already rejected one of the premises of this argument, we must reject the conclusion as well.[8]

---

[8]Blumeyer's reply brief contains a section with the implausible heading "The Prosecution Concedes That the Money Laundering Charges, Conviction and Sentencing Must Be Set Aside." Blumeyer Reply Br. at 13. Because this section of the brief contains numerous arguments not presented in Blumeyer's opening brief, as well as a highly questionable interpretation of the evidence, we grant the government's motion to strike. We further decline to consider the arguments in section IV of the same brief, which also were not presented in Blumeyer's opening brief. See United States v.

# III.

The jury instructions in this case are a source of contention for both defendants. Because neither defendant objected to the instructions on the grounds now pressed here or proposed an alternative instruction, our review is for plain error. See Stands, 105 F.3d at 1574.

Blumeyer and Peckham first complain that the three aspects of the scheme--defrauding policyholders and brokers, defrauding Missourians of Crump's honest services, and obtaining money and property by false pretenses--were given to the jury in the disjunctive, possibly enabling the jury to convict them without agreeing unanimously on a particular purpose for the scheme. We begin by noting that according to the plain language of the relevant statutes, any one of these three alternatives would support a conviction when combined with the requisite mail or wire transaction. See Clausen, 792 F.2d at 104 (recognizing that wire fraud statute outlaws schemes to defraud and schemes to obtain money or property by means of false pretenses); 18 U.S.C. § 1346 (1988) (defining "scheme to defraud" to include scheme to deprive others of intangible right of honest services). As the defendants concede, the government was required to indict them in the conjunctive in order to inform them fully of the charges against them. See United States v. McGinnis, 783 F.2d 755, 757 (8th Cir. 1986). But the government may properly revert to the disjunctive when the case is submitted to the jury, for proof of any one of the three goals of the scheme is sufficient to sustain a conviction. See id. We emphasize that the government consistently referred to the charges as involving a single scheme with several unlawful goals; we need not consider the complexities that may be involved in a prosecution

___

Darden, 70 F.3d 1507, 1549 n.18 (8th Cir. 1995) (noting that court of appeals ordinarily will not consider issues first raised in reply brief), cert. denied, 116 S. Ct. 1449, 2567 (1996).

alleging multiple schemes. See generally United States v. Gruenberg, 989 F.2d 971 (8th Cir.), cert. denied, 510 U.S. 873 (1993).

Turning to the unanimity issue, we have serious doubts whether the jury was required to agree on the precise manner in which the scheme violated the law. See Schad v. Arizona, 501 U.S. 624, 631-32 (1991) (plurality opinion) (noting that jurors returning general verdicts are not required to agree on a single means of commission of a crime); id. at 649 (Scalia, J., concurring) ("[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission."); United States v. Bellrichard, 62 F.3d 1046, 1049-50 (8th Cir. 1995) (holding that, in prosecution for mailing threatening communications, jurors were not required to agree as to which precise portion of a letter was threatening), cert. denied, 116 S. Ct. 1425 (1996). Indeed, if we were to adopt the defendants' position faithfully, we would have to abolish general verdicts or require the submission of incredibly detailed unanimity instructions in fraud cases, for the jurors would be required to agree not only on the general thrust of the scheme, but also on many other issues, such as whether the defendants employed a "scheme" or an "artifice."

Fortunately, we need not involve ourselves in such detail in the case at bar, for the District Court required the jury to reach a unanimous conclusion:

> The mail fraud and wire fraud counts charge a scheme which has three parts. You must consider each part of the scheme as to each defendant in accordance with these instructions. In order to find that a particular defendant devised or participated in any part of the scheme, you must find that the Government proved the existence of that part of the scheme beyond a reasonable doubt.

Instruction No. 33, reprinted in Government's App. at 177. Another instruction reiterated the need for a unanimous verdict. See Gruenberg, 989 F.2d at 975 (indicating that general unanimity instruction usually protects defendant's right to

unanimous verdict). The court conceivably might have been clearer in its explanation of the workings of the unanimity principle in this case, but we cannot conclude that this instruction constituted error, much less plain error.

We also reject the defendants' contention that the jury could have found them guilty solely because they obtained a certificate from the MDI by means of fraud. As we have discussed above, Granberry holds that obtaining a license fraudulently does not constitute mail fraud, and the defendants argue that the jury could have concluded that the certificate was "property" that they obtained by false pretenses. The defendants ignore the specific language of the instruction, however, which explained that "[t]he defendants are charged with obtaining money in the form of insurance premiums on the basis of false statements, representations and promises as set forth in the mail fraud and wire fraud counts." Instruction No. 33. Accordingly, the instruction explained the charges with sufficient clarity to insure that the defendants were not convicted solely because they defrauded the MDI.

## IV.

Both defendants also urge that the District Court erred in excluding certain evidence. Shortly before trial, the government filed, and the District Court granted, a motion in limine excluding the finding of Judge McHenry, the presiding judge in Bel-Aire's receivership proceedings, that Bel-Aire was not insolvent on certain dates. We review an order excluding evidence for abuse of discretion. See United States v. Shyres, 898 F.2d 647, 656 (8th Cir.), cert. denied, 498 U.S. 821 (1990). The defendants' motions to supplement the record for purposes of this argument are granted.

On October 3, 1990, the MDI filed a petition in state court seeking to place Bel-Aire into receivership, alleging as one ground for relief that Bel-Aire was insolvent. As noted above, the court appointed a temporary receiver for Bel-Aire and its affiliates, and the court then began proceedings to determine whether Bel-Aire was in fact

insolvent. Judge McHenry considered in particular two financial examinations of the company, dated December 31, 1989 and June 22, 1990. On November 23, 1992, more than two years after the receivership petition was filed, Judge McHenry determined that he was "unable to find on the basis of [these reports] or other evidence, that Bel-Aire was insolvent, either on the dates of the examinations or on the date this action was filed, October 3, 1990." Melahn v. Bel-Aire Ins. Co., No. CV190-1148CC, Opinion at 3 (Cir. Ct. Cole County Nov. 23, 1992). He also concluded, however, that because of the lack of arm's-length transactions among Bel-Aire and the affiliates, "further transaction of Bel-Aire's business subsequent to October 3, 1990 would be hazardous to its policyholders, its creditors, or the public." Id. at 7. He therefore enjoined the defendant companies from further conducting business and continued the MDI's temporary receivership. Less than a year later, Judge McHenry found that Bel-Aire had become insolvent and ordered it liquidated.

We agree with the District Court and the government that Judge McHenry's findings in the receivership proceedings were irrelevant to the case at bar and were likely to confuse the jury. Whether Bel-Aire was or was not insolvent for purposes of the state insurance laws, especially on three particular dates, had little to do with the issues in this case. Cf. United States v. Southwest Bus Sales, Inc., 20 F.3d 1449, 1457 (8th Cir. 1994) (holding that civil settlement between defendant and victim seeming to show that victim did not think it had been defrauded "does not influence the determination of whether or not a crime was committed"); United States v. Seago, 930 F.2d 482, 494 (6th Cir. 1991) (concluding that financial condition of defendant's company was "not probative" on issue of scheme to defraud); United States v. Stull, 743 F.2d 439, 445 (6th Cir. 1984) (affirming exclusion of evidence regarding civil proceeding between defendant and Postal Service because of potential for jury confusion), cert. denied, 470 U.S. 1062 (1985). Judge McHenry's findings were not binding on the federal government, which was not a party to the state-court proceedings. The motion in limine did not exclude all evidence relating to solvency or insolvency; only Judge McHenry's judicial findings were excluded. Although both the

District Court and the government insisted early in the trial that insolvency was entirely irrelevant, it soon became clear that evidence of insolvency formed a part of the government's theory of the case, and the defendants were permitted to cross-examine the government's witnesses on that subject. Nothing prohibited the defendants from producing evidence, other than Judge McHenry's findings, showing that Bel-Aire was solvent. We conclude that the District Court did not abuse its discretion in excluding the findings from the receivership proceedings.[9]

Even if exclusion of this evidence were improper, however, we would conclude that the error was harmless. First, had the defendants introduced Judge McHenry's finding that Bel-Aire was not insolvent, the government would undoubtedly have responded by stressing the judge's conclusion that continued operation of Bel-Aire would be "hazardous to its policyholders" and to the public. (It appears to us that this conclusion is more germane to a fraud prosecution than a finding that Bel-Aire was not insolvent, but in any event, it would more than outweigh whatever benefits the defendants might accrue by introducing Judge McHenry's view of the situation.) Blumeyer's suggestion that this evidence would somehow exonerate him therefore borders on the frivolous. Perhaps more importantly, despite the District Court's ruling, counsel for Blumeyer attempted several times to introduce this evidence and at one

_____

[9]At oral argument, counsel for the defendants articulated a new theory on this issue: because the government's witnesses testified that Bel-Aire was in receivership after October 1990, the defendants should have been able to introduce Judge McHenry's order on cross-examination to show that Bel-Aire was not and could not have been placed into receivership. We find this argument unpersuasive. Whatever the proper procedure under Missouri law, the fact remains that Judge McHenry appointed a "temporary receiver" for Bel-Aire. And even though he concluded in November 1992 that the MDI had not established insolvency as a proper ground for the receivership, he continued the receivership for other reasons. His order therefore does not show either that Bel-Aire was not in receivership or that it could not have been in receivership. (This is precisely the type of argument that has significant potential to confuse a jury and justifies exclusion of this sort of evidence.)

-22-

point even posed a full question: "As a matter of fact, they were found to be solvent, weren't they?" Tr. at 2225. The actual introduction of Judge McHenry's findings could have done little more to influence the jurors in favor of the defendants than this improper question.

## V.

We deal briefly with the defendants' remaining arguments. Our earlier decision on the jury-misconduct issue is the law of the case. See United States v. Bartsh, 69 F.3d 864, 866-67 (8th Cir. 1995). Blumeyer's claim of ineffective assistance of counsel is not ripe for review on direct appeal because no record was made on the issue before the District Court. See United States v. Triplett, 104 F.3d 1074, 1083 (8th Cir. 1997), petition for cert. filed (U.S. May 6, 1997) (No. 96-8895), and cert. denied, 65 U.S.L.W. 3767 (U.S. May 19, 1997) (No. 96-8738). We have considered the defendants' other arguments and have concluded that they are meritless.[10]

The convictions and sentences of the defendants are affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT

---

[10]These arguments are (1) Blumeyer's argument that a continuance should have been granted; (2) Peckham's argument that his case was prejudicially joined with Blumeyer's because of the money-laundering charges against Blumeyer; (3) Blumeyer's sentencing challenge to the calculation of the amount of loss; (4) Peckham's sentencing challenge seeking a downward departure based on aberrant behavior; (5) Peckham's argument that he was not shown to be connected to Atlantic General and Specialty; and (6) occasional rumblings in Blumeyer's briefs about perjured grand-jury testimony.