[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-10412

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FELIX SANTOYO,
MICHELLE CLAS,
FELICHA SANTOYO,

Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cr-00367-WFJ-TGW-2

————————————————

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

PER CURIAM:

This case is about a ghost-working scheme. After a jury trial, Defendants Felix Santoyo, Felicha Santoyo, and Michelle Clas were convicted of conspiracy to commit mail and wire fraud for collecting paychecks for work they did not perform. On appeal, they claim that insufficient evidence supported their convictions and that an alleged material variance between the conspiracy charged in the indictment and that proven at trial prejudiced them. After careful consideration, and with the benefit of oral argument, we affirm their convictions.

## I.    BACKGROUND

### A. Factual Background[1]

As we've noted, this case concerns a ghost-working scheme at Ceres Marine Terminals, Inc., which serviced cruise ships at the Port of Tampa. In short, the co-conspirators submitted fraudulent time sheets to obtain paychecks for work not actually performed. Michael Ruff, Ceres's Operations Manager for the Port of Tampa, was the mastermind of the scheme. The co-conspirators included

---

[1] We recount the facts from the evidence presented at trial and in the light most favorable to the verdict. *See United States v. Verdeza*, 69 F.4th 780, 785 n.1 (11th Cir. 2023).

Ruff's half-brother, Felix Santoyo; Ruff's half-sister, Felicha Santoyo; and Felicha's partner, Michelle Clas (collectively, "Defendants").[2]

Ceres had a collective-bargaining agreement with the International Longshoremen's Association, Local 1402, for work at the Port of Tampa. When a ship was due in port, Ruff submitted a labor order, and the union supplied members accordingly. But if the union could not supply enough members, non-union members, known as "casuals," could perform the work instead. "Casuals" still had to report to the union hall for work, so the union supplied all workers at the Port. And Ruff had no "nonunion direct reports."

Union members chose jobs before "casuals," so they "overwhelmingly" filled the more desirable jobs, like water man, porter, and forklift driver. Hours were typically 7 a.m. to 4 p.m., and there was "no work" for workers to do after the ships left.

Union leaders, known as "headers," gave "timekeepers" the crew members' names. Timekeepers, in turn, populated time sheets, which Ruff reviewed, edited, and uploaded for processing through Ceres's headquarters in Tennessee. Under this structure, individual workers did not "punch in," complete their own timesheets, or otherwise submit their hours. And under the collective-bargaining agreement, workers were paid for a certain number of hours no matter their actual time worked, so the timekeeper was not required to submit the "on and off times" for each person.

---

[2] To avoid confusion, we refer to the Santoyos by their first names.

After Ceres printed its paychecks, a common carrier delivered them to a UPS office in Florida, and Ruff picked them up for distribution at the union hall.

Ceres paid Felix, Felicha, and Clas through this system. Felix received $57,823.88 for 2,267.5 hours of "work" between July 2013 and December 2016. Felicha received $14,980.19 for 594 hours of "work" between September 2015 and November 2016. And Clas received $2,807.00 for 121.5 hours of "work" between March and November 2016.

Ruff submitted Form W-4s and other employment paperwork for Felix, Felicha, and Clas. Felix, Felicha, and Clas obtained Port IDs, required to access the Port of Tampa cruise terminals. [As part of their Port ID applications, Ruff certified that Ceres was their employer, and they needed access to secure areas of the port "as part of [their] employment." And Felicha and Clas signed each other's Port ID applications, specifically the part entitled "For Port Use Only." A person with business in the terminals could obtain a visitor pass five times in a ninety-day period but otherwise was required to display a Port ID at all times.

Transportation Workers Identification Credentials ("TWIC"), issued by the federal Transportation Security Administration, were also required to access nearly all the areas inside the cruise terminals, including the areas where workers loaded and unloaded ships. Longtime union members testified that both union workers and "casuals" needed both a Port ID and TWIC card. But Felix, Felicha, and Clas did not obtain or attempt to obtain a TWIC

card.  TWIC holders (like Ruff) could escort up to five people to the dock but had to remain with them.  So Ruff could not escort multiple individuals working different jobs to different areas of the port at the same time.

If an individual worked at least 700 hours in a year, he became eligible for benefits.  In 2016, Felix was on the list of eligible workers.  A union employee reviewed the list but didn't recognize Felix's name.  She asked senior union members, who didn't recognize Felix's name either.  So she asked Ruff, who told her to remove Felix from that list.  She did not do so.  Felix completed benefits paperwork, and Ceres sent him a check for vacation and holiday pay.

At some point, the Ceres supervisor who oversaw the Port of Tampa was contacted about the Santoyos.  And the conspiracy was revealed.

A federal grand jury indicted Defendants and other alleged co-conspirators—Ruff, Jose Trujillo, and Stephanie Telesmanick[3]—on one count of conspiracy to commit mail and wire fraud in

---

[3] Ruff pled guilty before trial and was sentenced to 41 months of incarceration, plus $174,751.89 in restitution (jointly and severally with his codefendants). After Defendants' trial, Trujillo pled guilty to conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 371, pursuant to a superseding information, and was sentenced to 12 months of incarceration.  Telesmanick entered into a diversion program, through which her case was ultimately dismissed.  Jerry Reyes, who the indictment identified but did not charge, also pled guilty in his separate case and was sentenced to five years' probation. Case No. 8:18-cr-287-T-17MAP (M.D. Fla.).

violation of 18 U.S.C. § 1349.  The indictment approximated the proceeds of the fraud to be $113,000.

### B.  Trial Evidence

Defendants proceeded to a three-day trial.  We organize the trial evidence into three categories: (1) union employee testimony, (2) co-conspirator testimony, and (3) "impossibility" evidence.

### 1.  Union Employee Testimony

Six longtime union members testified that they did not know or recognize Defendants, by name or otherwise.  One witness testified that "99 percent of our local is [B]lack" and male, so a Hispanic or female worker would have "st[ood] out to" him.  (The Santoyos are Hispanic, and Felicha and Clas are women).  Another witness testified that very few women worked as forklift operators—he could recall only one female forklift operator, who was Black.

What's more, union witnesses testified that the jobs that Defendants were listed as performing (water man, porter, and forklift operator) were the most popular with senior union members, so it would be unusual for "casuals" like Defendants to fill those roles at all, much less on a regular basis.  And a forklift operator had to be certified, which required a 20-hour class and a test.

Defendants called four other longtime union members to testify that they *did* recognize or work with Defendants.  One witness testified that he had seen Felix, Felicha, and Clas working at the Port "occasionally," while another claimed he had seen Felix

"often" (but not Felicha or Clas).  Another testified that Felicha worked at the Port "at the most at least like about five times. Another said that he had seen Clas "working on the dock every now and then with" Felicha.

### 2. Co-Conspirator Testimony

Telesmanick and Reyes testified at trial.  First, Telesmanick testified that, though she never performed any work at the Port, Ceres paid her $875 in checks that she and her then-husband cashed.  Telesmanick thought Ruff was her husband's boss, but her husband lacked identification documents.  So Ruff asked Telesmanick to complete a W-4 so her husband could get paid, since they were filing tax returns jointly.  Telesmanick testified that Defendants were her neighbors, but she did not conspire with them.

Reyes similarly testified that he received $10,862.94 in paychecks from Ceres in 2015 and 2016, even though he never worked at the Port of Tampa.  Ruff proposed registering Reyes as an employee and obtaining paychecks in Reyes's name.  Reyes split the checks with Ruff.  Reyes confirmed that he did not know or interact with Felix, Felicha, or Clas.

### 3. "Impossibility" Evidence

Finally, the Government presented evidence that Defendants could not possibly have worked the hours for which Ceres paid them.  In the most obvious example of this type of evidence, the Government introduced timesheets that show that Felix worked more than 24 hours on certain days.  And on at least one of those days, Felix's bank card (which was solely in his name) was used in

the Miami area, even though Felix was allegedly working at that time at the Port of Tampa.[4]  Similarly, Felicha's bank card (which was solely in her name) was used in Miami on several days that she purportedly worked at the Port of Tampa.

The Government also called Felix and Clas's former employers to testify that they worked full-time while they were purportedly also working at the Port of Tampa.  According to the trial evidence, Felix worked full-time in Doral (near Miami) from 2012 or 2013 through 2014.  And he has worked full-time for another (Tampa-area) company since January 2015.  Similarly, Clas's former employer testified that Clas worked full-time from March 2016 through June 2020 and never mentioned having another job.

Also in the "impossibility" category, Felix purportedly worked for 69 days, and Felicha purportedly worked for 30 days, before receiving a Port ID.  None of the Defendants applied for or obtained a TWIC card at any point.  And Ceres had no forklift certification for Felix, Felicha, or Clas, even though they purportedly worked as forklift operators several times.

Last, though it does not fit cleanly into these categories, Felix's bank records showed that, during the relevant period, he wrote at least 17 checks to Ruff in amounts ranging from $89 to $1343 and totaling $9000, some with the memo "Loan payment" or "Loan (Personal)."

---

[4] Miami and Tampa are roughly 300 miles (at least a four-hour drive) apart.

### C. Procedural History

At the close of the Government's case, Defendants moved for judgment of acquittal. *See* Fed. R. Crim. P. 29(a). Defense counsel argued that the Government's evidence was "entirely circumstantial" and insufficient to prove the elements of conspiracy. The district court reserved ruling on that motion. It later denied Defendants' motion, finding that the evidence sufficiently supported the jury's verdict.

After trial, the jury convicted each defendant of one count of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349. The district court sentenced Felix to five years of probation and imposed a $57,823.88 restitution judgment. It also sentenced Felicha to five years of probation and imposed a $14,980.89 restitution judgment. And it sentenced Clas to three years of probation and imposed a $2,807.00 restitution judgment. Defendants do not challenge their sentences on appeal.

## II.    STANDARDS OF REVIEW

We review a district court's denial of a motion for judgment of acquittal de novo. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). Our review is "comparable to the standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United States v. Bergman*, 852 F.3d 1046, 1060 (11th Cir. 2017) (citation and internal quotation marks omitted). So we view the evidence in the light most favorable to the Government and draw all reasonable inferences and credibility choices in favor of the jury

verdict.[5] *See Chafin*, 788 F.3d at 1268. And we will neither "overturn a guilty verdict" nor "disturb the denial of a Rule 29 motion so long as a reasonable trier of fact could find guilt beyond a reasonable doubt." *Id.*

We will reverse a conviction based on a variance between the indictment and trial evidence only if that variance (1) was material and (2) substantially prejudiced the defendant. *See United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997). In conducting that inquiry, we view the evidence in the light most favorable to the Government. *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008).

## III.    DISCUSSION

On appeal, Defendants raise two challenges to their convictions. First, Defendants claim that the district court erred in denying their motions for judgment of acquittal because insufficient evidence supported their convictions. Second, Defendants assert that an alleged material variance between the conspiracy charged in the indictment and that proven at trial prejudiced them. Both challenges fail.

---

[5] The Government correctly notes that we are limited to the evidence presented during its case-in-chief, since the district court reserved ruling on the defense's first Rule 29 motion. *See United States v. Moore*, 504 F.3d 1345, 1346 (11th Cir. 2007); Fed. R. Crim. P. 29(b).

### A.  Sufficient evidence supported Defendants' convictions.

"Because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (quoting *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998)).  But we have repeatedly stated that "[t]he test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v. Guevara*, 894 F.3d 1301, 1307 (11th Cir. 2018) (citation and internal quotation marks omitted).

Here, the Government presented sufficient circumstantial evidence to support Defendants' convictions.  Before we identify that evidence, we recount the relevant legal framework.

A conspiracy requires proof of three elements: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant[s'] knowing and voluntary participation in the conspiracy; and (3) an overt act in furtherance of the conspiracy." *United States v. McQueen*, 727 F.3d 1144, 1153 (11th Cir. 2013) (alteration in original) (citation and internal quotation marks omitted).  "The essence of the conspiracy is this agreement to commit an unlawful act." *United States v. Chandler*, 388 F.3d 796, 805 (11th Cir. 2004).

### 1.  Agreement

First, the unlawful objective of this conspiracy was mail and wire fraud.    Mail  and  wire  fraud  requires  "(1)  intentional

participation in a scheme to defraud, and, (2) the use of the interstate mails or wires in furtherance of that scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). No party disputes that sufficient evidence supports the second piece. Nor could they—Ruff used interstate wires to upload the fraudulent timesheets, and Ceres mailed the paychecks through an interstate carrier. And Ruff's scheme defrauded Ceres out of over $100,000.

Defendants contest their "agreement" and "intentional participation" in the scheme. But the evidence supports the conclusion that they were not mere unwitting participants. Defendants submitted W-4s, applied for Port IDs, and, in Felix's case, even applied for union benefits. Ruff had to sign those Port ID applications and attest that Ceres was Defendants' employer. Defendants intended to get paid by Ceres. And circumstantial evidence indicated that Felix, at least, shared some of his proceeds with Ruff. From this evidence, a jury could reasonably conclude that Defendants agreed with Ruff to defraud Ceres by accepting paychecks for work they did not perform. So the first element of conspiracy is satisfied here.

### 2. Knowing and Voluntary Participation

Second, sufficient evidence supported a jury finding that Defendants knowingly and voluntarily participated in the conspiracy. A defendant need not know of or agree to "every aspect of the conspiracy" so long as he "knew of [its] essential nature." *Bergman*, 852 F.3d at 1065 (citation and internal quotation marks omitted). Indeed, "a defendant can be convicted even if his or her participation

in the scheme is 'slight' by comparison to the actions of other co-conspirators." *Toler*, 144 F.3d at 1428. And a jury can infer such participation "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *United States v. Wheeler*, 16 F.4th 805, 823 (11th Cir. 2021) (citation and internal quotation marks omitted).

Defendants maintain that they performed legitimate work at the Port. And even if Ruff was inflating their hours, they contend, they did not know he was doing so. We are not persuaded.

We return to the three categories of trial evidence. *See* I.B, *supra*. To recap, first, multiple longtime union members testified that they did not know or recognize Defendants and that it would be unusual for "casuals" to regularly perform the jobs Defendants purportedly performed. To be sure, Defendants called witnesses who testified to the opposite. But because the district court reserved ruling on Defendants' Rule 29 motion, we consider only the Government's evidence for the purposes of our sufficiency review. *See Moore*, 504 F.3d at 1346.

But even if we considered defense evidence, the jury was entitled to find the Government's union witnesses more credible. And even if it credited the defense witnesses in full, the jury could have concluded that Defendants performed some legitimate work at the Port but not enough to warrant the amount of their paychecks. For example, the jury could have credited one witness's testimony that he saw Felix work at the Port "occasionally" on "miscellaneous jobs" but still find that Felix did not work the

2,267.5 hours for which Ceres paid him. Similarly, the jury could have credited another witness's testimony that she saw Felicha and Clas work at the Port "at the most at least like about five times" but still find that they did not work 594 and 121.5 hours, respectively. Defendants apparently assert that the jury should have believed their witnesses over the Government's. But it is not our role on sufficiency review to reweigh the evidence. Nor must the evidence render the jury's verdict "inevitable" so long as it is "reasonable." *See, e.g.*, *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007).

The second category of trial evidence further supported the jury's finding. Again, both Telesmanick and Reyes—who pled guilty to conspiracy—testified that Ruff recruited and paid them, though they never worked at the Port. While some factual differences exist between Defendants' positions and those of Telesmanick and Reyes, a jury could have reasonably concluded that Ruff engaged in the same scheme with Telesmanick, Reyes, and Defendants.

Finally, we turn to the third category: the "impossibility" evidence. From this evidence, a jury could reasonably have concluded that Defendants did not work—and indeed could not have worked—all (or any) of the hours for which they were paid. For instance, Felix worked a full-time job in Doral through 2014, so a jury could conclude that he could not possibly have worked full-time at the Port of Tampa as well. And a jury could have rejected defense counsel's theory that Felix regularly made the four-hour drive from Doral to Tampa. What's more, Felix could not possibly

23-10412                 Opinion of the Court                 15

have worked more than 24 hours in a day, yet he was paid for 25, 26, or even 27 hours on certain days.  The Government also presented evidence of Clas's full-time job during the relevant period, so a jury could reasonably conclude that she could not possibly have worked full-time at the Port as well.

And on several days on which Felix and Felicha purportedly worked at the Port of Tampa, their bank cards were used (with a PIN[6]) in the Miami area.  Again, a jury could exercise its common sense to conclude that Felix and Felicha were not in both Miami and Tampa on the same day.  *See United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010) ("[K]nowledge can be inferred reasonably based on ordinary human experience for which no special proof is required; a trier of fact can rely on common sense.").

Rounding out this category, the Government elicited testimony from several witnesses that both a Port ID and TWIC card were required to work at the Port, yet Defendants did not have TWIC cards.  Ceres also paid Felix and Felicha for work before they even applied for Port IDs.  A jury could reasonably conclude that, without a valid Port ID and TWIC card, Defendants could not have

---

[6] A PIN is a personal identification number, which provides an additional layer of security for bank-card transactions.  *See* Julia Kagan, *Personal Identification Number (PIN): What It Is, How It's Used*, Investopedia (Mar. 9, 2024), https://www.investopedia.com/terms/p/personal-identification-number.asp [https://perma.cc/6PLW-KYJJ].  So while another person could theoretically have used Felix or Felicha's bank card, they would need to have known the PIN.  *See id.*

performed the work they were paid for. The same goes for Defendants' lack of forklift certifications.

In sum, between the union employees' testimony, the co-conspirators' testimony, and the "impossibility" evidence, the jury had sufficient evidence to conclude that Defendants accepted paychecks for work they did not perform and thus participated in the conspiracy. What remains is whether Defendants did so knowingly and voluntarily. *See McQueen*, 727 F.3d at 1153.

We have found that defendants' personal profits, especially in amounts exceeding those to which they were reasonably entitled, can be circumstantial evidence that they knew of and voluntarily joined a conspiracy. *See, e.g.*, *United States v. Navarro-Ordas*, 770 F.2d 959, 966 (11th Cir. 1985) (rejecting sufficiency challenge where defendant "stood to profit personally from the conspiracy"); *United States v. Maurya*, 25 F.4th 829, 841 (11th Cir. 2022) (evidence that defendant "received far more money than he could have expected from ordinary distributions" supported finding that he knowingly joined wire-fraud conspiracy); *cf. also United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) ("Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud."); *United States v. Pearlstein*, 576 F.2d 531, 542 (3d Cir. 1978) ("over-generous compensation also may implicate a defendant in allegedly illicit activity, or at least serve to put him on notice of suspicious dealings"). Here, Defendants profited from their participation in the fraudulent-timesheet scheme. And even if they performed some legitimate

work, their inflated paychecks contained "more money than [they] could have expected," which should have put them on notice that something unlawful was afoot. *See Maurya*, 25 F.4th at 841.

Defendants rely chiefly on *United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988), but that case is distinguishable. In *Parker*, we reversed brokers' convictions for conspiracy to commit wire fraud based on the brokerage president's scheme to fraudulently sell under-collateralized investment instruments. *Id.* at 1475. We reasoned that the brokers did not necessarily know that the president's representations were fraudulent, nor did they otherwise agree to defraud customers. *See id.* at 1478. Here, by contrast, Defendants accepted the paychecks, so they knew or reasonably should have known that they were being paid for work they did not perform. In other words, the defendants in *Parker* may not have known they were participating in fraud, but drawing all reasonable inferences in favor of the jury's verdict, we cannot conclude that Defendants were similarly unaware.

Separately, Defendants point to the indictment's language to argue that the Government failed to prove its case. Defendants claim that the Government presented evidence that they interacted with Ruff but "no evidence that any of them met with or interacted with each other to promote or further the conspiracy." They also contend that insufficient evidence supported the conclusion that they gave Ruff a portion of their paychecks. Both arguments are unavailing.

First, the Government did not have to prove each alleged "Manner and Means" in the indictment. The indictment charged the manner and means of the conspiracy in the conjunctive, meaning the jury needed to find beyond a reasonable doubt only that Defendants conspired in one of the charged ways. *See United States v. Kincherlow*, 88 F.4th 897, 905–06 (11th Cir. 2023). Indeed, "the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *United States v. Rivera*, 77 F.3d 1348, 1351 (11th Cir. 1996) (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)).

To be sure, the indictment stated that Defendants would "share their proceeds with" Ruff and "engage in meetings . . . to promote and achieve the objects of the conspiracy." But the charged "Manner and Means" also included Defendants' receipt of "payroll checks fraudulently obtained from Ceres and payable to" Defendants. As charged, that manner of conspiracy required neither meetings between the alleged co-conspirators nor kickbacks to Ruff. So while the Government could have drafted the indictment more precisely, it was not required to do so to survive a sufficiency challenge.

But even for the sake of argument, it seems highly implausible that Defendants never "interacted with each other" to "further the conspiracy." Felix, Felicha, and Ruff are siblings, and Clas is Felicha's longtime partner. A jury could reasonably infer that family members participating in the same conspiracy were aware of or discussed each other's participation in that conspiracy. *See United States v. Brantley*, 68 F.3d 1283, 1288 (11th Cir. 1995) (reasoning that

the "personal relationship" between the defendant and his wife's brother made the defendant's lack of knowledge "unlikely"). And Defendants certainly interacted with Ruff in furtherance of the conspiracy. *See Toler*, 144 F.3d at 1428 ("a defendant's guilt can be established if his or her contact extends to only a few or even one of the co-conspirators so long as the agreement . . . and the defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt").

Defense witnesses also testified that they saw Felix "work" with Ruff and Felicha "work" with Clas at the Port. A jury reasonably could have inferred that Defendants performed *some* legitimate work (or pretended to do so) at the Port to evade detection of the fraud and in turn further the conspiracy. *See United States v. Reeves*, 742 F.3d 487, 500 (11th Cir. 2014) ("[E]fforts to conceal a conspiracy may support the inference that a defendant knew of the conspiracy and joined it while it was in operation."). And according to the trial evidence, Defendants interacted with each other when they did so.

Defendants' second argument is similarly unavailing. To be sure, the Government did not present evidence that Felicha and Clas paid kickbacks to Ruff. But it did so for Felix. And while the evidence was circumstantial, a jury reasonably could have inferred that Felix's repeated checks to Ruff during the relevant period were kickbacks of the proceeds from the fraudulent scheme. Felix claims that any payments to Ruff "could have been made in thanks for Ruff having secured work for Santoyo" or simply "to support"

his brother, but a jury was entitled to reject those theories. *See, e.g.*, *Browne*, 505 F.3d at 1253 ("the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial" (citation and internal quotation marks omitted)). And in any case, the payment of kickbacks was not an essential element of the conspiracy. At its core, the conspiracy's object was to fraudulently obtain paychecks for work not actually performed.

At bottom, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt" to survive a sufficiency challenge. *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (citation and internal quotation marks omitted). We conclude that the evidence cleared that standard with respect to Defendants' knowing and voluntary participation in the conspiracy.

### 3. *Overt Act*

Returning to the elements of conspiracy, the overt-act requirement is easily satisfied here (and Defendants do not contest that). At a minimum, Ruff submitted fraudulent timesheets to Ceres and picked up inflated paychecks from an interstate carrier. That is enough. So sufficient evidence supported each element of Defendants' conspiracy convictions, and we reject Defendants' sufficiency challenge.

### B.  Defendants were not prejudiced by any variance between the indictment and trial evidence.

We turn now to Defendants' variance arguments.  We will reverse a conspiracy conviction based on a variance between the conspiracy charged in the indictment and the trial evidence only if the variance (1) is material and (2) substantially prejudiced the defendant.  *Calderon*, 127 F.3d at 1327; *United States v. Coy*, 19 F.3d 629, 633 (11th Cir. 1994).  Even if Defendants have shown a material variance here, they were not prejudiced.

### 1.  Material Variance

A variance is not material if, viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that a single conspiracy existed.  *Calderon*, 127 F.3d at 1327.  Three factors inform that inquiry: "(1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of participants."  *Richardson*, 532 F.3d at 1284 (citation and internal quotation marks omitted).  We apply those factors below.

First, a jury could reasonably have found that the co-conspirators shared a common goal: to defraud Ceres out of money by accepting payment for work not actually performed.  We define the "common goal" requirement "as broadly as possible."  *Richardson*, 532 F.3d at 1285 (citation and internal quotation marks omitted); *cf. also United States v. Huff*, 609 F.3d 1240, 1244 (11th Cir. 2010) (finding "a common goal" where alleged co-conspirators "worked in concert to defraud the government for their personal benefit");

*Coy*, 19 F.3d at 633 (suggesting that "common crime" of "fraud" can satisfy "common goal" requirement). To be "common," a goal need only be "'similar' or 'substantially the same' rather than 'shared' or 'coordinate.'" *Calderon*, 127 F.3d at 1327 (quoting *Coy*, 19 F.3d at 633). Here, the jury reasonably could have found that Defendants each accepted and cashed Ceres paychecks without doing any work (or without doing some of the work for which they were paid), and that they did so with the "same," *see id.*, goal of profiting financially.

Second, the nature of the scheme was consistent across the alleged co-conspirators. Namely, "each coconspirator worked with [Ruff] according to [Ruff's] general scheme," even if they did not all "work[] together." *See Richardson*, 532 F.3d at 1285.

Third, the participants overlapped. Each defendant conspired with Ruff, who "played a central role." *See id.* Under our precedent, evidence that a "key man" "knowingly involved himself with each conspiratorial act proved at trial is enough for the jury to have concluded that a single conspiracy existed." *Id.* at 1286; *see also United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) ("the finding of a single conspiracy is permitted where a 'key man' directs and coordinates the activities and individual efforts of various combinations of people"). And we have found co-conspirators' "relationship with each other" to be relevant to this factor. *See Huff*, 609 F.3d at 1244 (finding substantial overlap in part because alleged co-conspirators were "good friends and fishing buddies" and engaged in fraud during the same time period); *United States v. Holt*,

777 F.3d 1234, 1264 (11th Cir. 2015) (same, where alleged co-conspirators "knew and interacted with" and had "direct connections with" each other). Based on this analysis, all three factors weigh in favor of finding no material variance here.

Still, Defendants contend that the jury could *not* have found a single conspiracy, because Ruff's scheme was a "rimless wheel."

In a "hub-and-spoke" conspiracy, a "central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise." *Chandler*, 388 F.3d at 807. The core conspirators are the "hub," and each separate group of co-conspirators is a "spoke." *See id.* And "[t]he core conspirators move from spoke to spoke, directing the functions of the conspiracy." *Id.* When "the various spokes are aware of each other and of their common aim," there is a single conspiracy. *United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009). But "where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." *Chandler*, 388 F.3d at 807. Such a conspiracy is a so-called "rimless wheel" conspiracy. *See Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002) ("a wheel without a rim is not a single conspiracy").

Defendants are arguably correct that Ruff's scheme was a "hub-and-spoke" conspiracy, with himself as the "hub" and each "ghost worker" as a separate spoke. On this record, at least portions of the "wheel" were "rimless"—there is no evidence that

Reyes knew of Defendants or that Defendants knew of him. And there was no mention of Trujillo at trial. Telesmanick is a closer call because she was Defendants' neighbor, so the jury could reasonably infer that Defendants knew she was also part of the fraudulent scheme. But if at least one co-conspirator was unaware of the others or of the common scheme, that spoke "acted independently and was an end unto itself." *See Chandler*, 388 F.3d at 812; *see also United States v. Rosnow*, 977 F.2d 399, 406 (8th Cir. 1992) (finding rimless "wheel" conspiracy where alleged co-conspirators acted "to benefit themselves individually" and "did not care about the success of the other defendants").

That said, "[i]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the [G]overnment must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators." *Richardson*, 532 F.3d at 1284 (citation and internal quotation marks omitted); *see also United States v. Dorsey*, 819 F.2d 1055, 1059 (11th Cir. 1987) ("While each defendant must have joined the conspiracy intentionally, each need not be privy to all the details of the conspiracy or be aware of all the other conspirators."). And the facts here are markedly distinguishable from our leading "rimless wheel" case, *Chandler*.

In *Chandler*, the Government charged 43 defendants with conspiracy to commit mail fraud for submitting stolen Monopoly game stamps to McDonald's and collecting prize money. *See* 388 F.3d at 799. The "hub" conspirator, Jacobson, embezzled winning

stamps and used "recruiters" to solicit "winners" to collect the prize money. *Id.* They then shared the money with Jacobson. *Id.* Those "recruiters" and "winners" were charged as co-conspirators. *Id.* But the alleged co-conspirators did not know about Jacobson's theft. *Id.* at 806–07. Indeed, Jacobson admitted at trial, "*not one* of his recruiters" or winners "knew any of the others, or even about his theft of the stamps." *Id.* at 807. We found that the scheme was a "rimless wheel" conspiracy, because Jacobson "moved alone" from "spoke to spoke," and there was "no connection whatsoever between the various spokes of Jacobson's scheme." *Id.* at 807–08.

Here, unlike the "winners" in *Chandler*, Defendants knew the "hub" conspirator, Ruff. *See Huff*, 609 F.3d at 1244 n.2 (distinguishing *Chandler* because alleged co-conspirators "interacted with one another" and with the "hub" conspirators). And Defendants knew of each other's existence and had reason to know that they were all receiving fraudulent paychecks from Ceres. Most importantly, while the *Chandler* "winners" had no reason to know that the game stamps were stolen, Defendants had reason to know their paychecks were fraudulent, i.e., that they were getting paid for work they didn't perform. *Chandler* does not compel us to find a material variance here.

### 2. Prejudice

But even if we assume a material variance for the sake of argument, Defendants cannot show prejudice.[7] Prejudice

---

[7] Felicha makes no prejudice-related arguments other than the bare assertion that she was "substantially prejudiced." Because she raises the issue "in a

26                    Opinion of the Court                    23-10412

materializes if (1) a defendant is deprived of fair notice of the crimes for which he will be tried, or (2) there is a "spillover" effect from evidence of other crimes at trial. *United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998). A "spillover effect" occurs if there are "so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another." *Calderon,* 127 F.3d at 1328. Defendants cannot make either showing here.

First, Defendants were not deprived of fair notice in preparing their defenses. Whether the indictment charged a single conspiracy or multiple conspiracies, Defendants knew they would have to defend against allegations that they each conspired with Ruff to defraud Ceres by cashing paychecks for work they did not perform. *Cf. id.* (finding it "unlikely that the defense at trial would have varied because, in either event, the underlying crimes charged and elements of proof would have been identical"). The material-variance rule is intended to protect defendants from prosecutions based "on an entirely different theory." *See Chandler*, 388 F.3d at 798. Indeed, "[i]ll-defined charges leave 'the prosecution free to roam at large— to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal.'" *United States v. Adkinson*, 135 F.3d 1363, 1374 (11th Cir. 1998) (quoting *Russell v. United States*, 369 U.S. 749, 768 (1962)). Here, any variation between the

---

perfunctory manner without supporting arguments or authority," it is abandoned. *Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681 (11th Cir. 2014). By contrast, Felix and Clas briefed the prejudice issue.

indictment and trial evidence did not rise to the level of "an entirely different theory," *see Chandler*, 388 F.3d at 798, or a "roam[ing]" prosecution, *see Adkinson*, 135 F.3d at 1374, such that Defendants were prejudiced.

Second, Defendants were not substantially prejudiced by any "spillover" effect. Felix argues that he was less culpable than Telesmanick and Reyes because he performed *some* legitimate work at the Port, and he was prejudiced by any association with them. But even if the alleged co-conspirators had been charged in separate indictments, the Government likely would have called Reyes and Telesmanick to testify, leaving Defendants to distinguish themselves from these quintessential "ghost workers." *Cf. Richardson*, 532 F.3d at 1287 (reasoning that alleged co-conspirator testimony would have been admissible as "knowledge" evidence under Fed. R. Evid. 404(b)).

In any event, the evidence was not so complex that the jury could not distinguish between Defendants and the other "ghost workers." *Cf. United States v. Caporale*, 806 F.2d 1487, 1501 (11th Cir. 1986) (fraud "case involving eleven defendants and two possible conspiracies [was] not so complex by definition that the jury [would] be unable to segregate the evidence properly"). Rather, as our sister circuit has reasoned, "prejudice should be minimized by the fact that those transactions not directly involving [each defendant] were of the same character as the ones that did involve him and by the fact that the trial was relatively simple and short." *United States v. Levine*, 569 F.2d 1175, 1177 (1st Cir. 1978). And a defendant

is not prejudiced simply because he is less culpable than his co-conspirators.

As a final matter, the district court instructed the jury that it could convict "only if" it found that the co-conspirators "agreed to try to accomplish a common and unlawful plan to commit wire fraud or mail fraud as charged in the indictment," and Defendants "knew the unlawful purpose of the plan and willfully joined in it." To be sure, the district court did not give a multiple-conspiracies instruction, ostensibly because Defendants did not request one. But the jury was not left with the impression that it could convict merely if each "spoke" involved "illegitimate" activity, even if the "spokes" did not know of or agree to a common scheme. *Cf. Chandler*, 388 F.3d at 813. That cuts against any finding of prejudice.

Because Defendants have not shown prejudice, they are not entitled to relief even if there was a material variance between indictment and trial. *See Calderon*, 127 F.3d at 1327. So we reject their variance arguments.

## IV.    CONCLUSION

For the reasons we've discussed, we affirm Defendants' conspiracy convictions.

**AFFIRMED.**